**UNITED STATES of America, Plaintiff,**

v.

**Jesus Rubio DURAN, Defendant.**

**Criminal No. 14–392(2) ADM/SER.**

United States District Court, D. Minnesota.

Signed May 19, 2015.

---

Thomas Calhoun–Lopez, Esq., Assistant United States Attorney, United States Attorney's Office, Minneapolis, MN, for Plaintiff.

Kirk M. Anderson, Esq., Anderson Law Firm, PLLC, Minneapolis, MN, for Defendant.

## MEMORANDUM OPINION AND ORDER

ANN D. MONTGOMERY, District Judge.

### I. INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on Jesus Rubio Duran's ("Duran") Objections [Docket No. 86] to Magistrate Judge Steven E. Rau's April 21, 2015 Report and Recommendation [Docket No. 85] ("R & R"). In the R & R, Judge Rau recommends denying Duran's Motion to Suppress Physical Evidence [Docket No. 51] and Motion to Suppress Statements [Docket No. 52]. After a thorough de novo review of the record and for the reasons stated below, Duran's Objections are overruled and Judge Rau's R & R is adopted.

### II. BACKGROUND [1]

On November 5, 2014, Officer Christian Freichels ("Officer Freichels") and other

---

1. The following facts are taken from Judge Rau's R & R, which themselves are drawn from the testimony at the February 23, 2015 hearing. A condensed version of the facts is presented here; a full recitation of the facts is presented in Judge Rau's R & R.

law enforcement officers executed search warrants at two separate addresses in Maplewood, Minnesota, one on Nebraska Avenue and one on Larpenteur Avenue. At the Nebraska Avenue address, a large amount of currency, drug ledgers, and a small amount of drugs was discovered. At the Larpenteur Avenue address, officers found a digital scale with methamphetamine residue. While law enforcement officers were searching the Larpenteur Avenue address, Alejandro Reyes–Rojas ("Reyes–Rojas") entered the apartment. The officers believed Reyes–Rojas entered the apartment to retrieve drug proceeds. Reyes–Rojas was driven to the apartment by Rivas.[2] After speaking with both Reyes–Rojas and Rivas, officers determined that the men had come from Reyes–Rojas's apartment on McKnight Avenue. Rivas agreed to show the officers where the apartment was located.

After arriving in the vicinity of the McKnight Avenue apartment, Rivas identified a man driving around in the parking lot as someone who was previously inside the apartment. Sergeant Burt Emerson ("Sergeant Emerson"), who was conducting surveillance of the apartment, believed that the individual was either waiting for someone or conducting counter-surveillance.

The officers reported that the occupants of the McKnight Avenue apartment appeared concerned that they were being watched. Earlier, an individual cooperating with law enforcement told Officer Freichels that members of the drug trafficking organization under investigation may try to remove or destroy evidence if they suspected or learned one of their associates was arrested or unreachable. Officer Freichels was concerned that individuals connected to Reyes–Rojas could have learned that he was arrested. Concerned about evidence destruction, Officer Frei-

chels believed time was of the essence and ordered officers to knock at the door of the McKnight Avenue apartment immediately.

At least four officers approached the door of the apartment. The officers were wearing street clothes and vests identifying them as law enforcement. Their badges were also visible. It is uncertain if any of the officers displayed their weapons. One of the officers knocked on the door, which was opened by Duran. At this stage of the investigation, Duran was unknown to law enforcement. Commander Richard Clark ("Commander Clark") asked for permission to enter. In response, Duran turned slightly to the side while raising one arm near his waist. The investigators interpreted this motion as a gesture for them to enter the apartment.

Upon entering the apartment, the officers observed the same individual who had been previously seen circling the parking lot. During the course of a protective sweep, Sergeant Emerson and Commander Clark observed drug materials in plain view. While a search warrant was obtained, Duran and the other occupant were handcuffed. None of the officers conducted any additional searches prior to the warrant being signed.

Officer Freichels executed the search warrant later that day. The search revealed approximately two pounds of methamphetamine. Officer Freichels summoned Officer Aguirre, a Spanish speaking officer, to assist in interviewing Duran in the back bedroom of the apartment. Officer Aguirre read Duran his *Miranda* rights from a standard DEA card. Duran did not sign a waiver form but he stated that he understood his rights and he agreed to speak with Officer Freichels.

Duran's interview lasted approximately ten minutes. Duran admitted knowledge

---

**2.** Rivas' first name does not appear in the record.

of the drugs but denied involvement in their sale. Duran did admit depositing money into a Wells Fargo bank account under the direction of Reyes–Rojas. During the interview, Duran was calm; he did not raise his voice or have any emotional outbursts. Officer Freichels described Duran's answers as coherent and believed Duran to be of average intelligence. Officer Freichels did not raise his voice or draw his weapon during the interview. The interview concluded when Duran refused to answer any further questions.

Duran moves to suppress the physical evidence discovered in plain view as a result of the warrantless entry. Without the evidence discovered by the officers in plain view, Duran argues that the search warrant was not supported by probable cause. Duran additionally moves to suppress the statements made to Officer Freichels under the theory that his waiver of his right to an attorney was involuntarily obtained because of the police-dominated environment. In the R & R, Judge Rau recommends denying both motions, concluding that Duran voluntarily consented to the warrantless entry and that his waiver prior to making any statements to law enforcement was voluntary, knowing, and intelligent. Duran now objects to the recommendation denying his motions to suppress.

### III. DISCUSSION

#### A. Standard of Review

"A district judge may refer to a magistrate judge for recommendation a defendant's motion to dismiss or quash an indictment or information, a motion to suppress evidence, or any matter that may dispose of a charge or defense." Fed.R.Crim.P. 59(b)(1). In reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); see also D. Minn. L.R. 72.2(b). A district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id.

#### B. Motion to Suppress Physical Evidence

##### 1. Voluntary Consent

Duran objects to Judge Rau's conclusion that the warrantless entry into the McKnight Avenue apartment was lawful. Duran argues that the Government did not meet its burden of showing that Duran voluntarily consented to the officers' entrance. Specifically, Duran's objection focuses on the uncertainty of whether any of the four officers had their firearms drawn at the time Duran opened the apartment door in response to their knock.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment's general prohibition against warrantless searches does not apply when officers obtain voluntary consent from the person whose property is searched or from a third party with common authority over the property." United States v. Esparza, 162 F.3d 978, 980 (8th Cir.1998) (citing Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). Voluntary consent does not need to rise to the level of waiver and can be voluntary without being an "intentional relinquishment or abandonment of a known right or privilege." United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 235, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).

■ To assess whether consent was actually voluntary, courts are directed to examine the totality of the circumstances surrounding the consent, including the following relevant factors:

(1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [her] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*United States v. Quintero,* 648 F.3d 660, 667 (8th Cir.2011) (citation omitted) (citing *United States v. Golinveaux,* 611 F.3d 956, 959 (8th Cir.2010)). The Government bears the burden of proving voluntary consent. *United States v. Willie,* 462 F.3d 892, 896 (8th Cir.2006).

■ Doran argues that he did not voluntarily consent to the officers' entrance into the McKnight Avenue apartment. Doran's objection emphasizes that four officers dressed in jackets with "POLICE" or "SHERIFF" were standing directly in front of the apartment door, and there is uncertainty whether any weapons were unholstered or visible. Setting aside whether or not any firearms were displayed, there is no evidence that the officers used threats or other means of intimidation to involuntarily extract Duran's consent.

There is also no evidence to suggest that the officers acted in an aggressive, confrontational, or otherwise coercive manner to Duran at the apartment door. Commander Clark's question to Duran—"May we come in?" or "[Do] you mind if we come in?" or "Can we come inside and talk?"—lacks any semblance of a coercive demand or threat. Tr. [Docket No. 79] 13, 19.

Turning to the question of coercion by the presence of firearms, the record is unclear. While Sergeant Emerson does not recall whether he or anyone else displayed their firearms, Duran does not explicitly claim that he opened the apartment door to find one or more of the officers brandishing their firearms. Indeed, in his suppression motion memorandum and objection, Duran only argues the uncertainty of the officer's testimony. *See* Def.'s Mem. Support Mot. Suppress [Docket No. 80] 6 ("It is important to note that Off. Emerson could not recall if he, or the other officers had their firearms drawn at the time Defendant opened the door, but they were all armed."); Def.'s Obj. R & R [Docket No. 86] 2 ("Not being able to recall whether firearms were drawn, and not actually having them drawn are two (2) very different things.").

Even if this uncertainty is resolved in Duran's favor and firearms were displayed, the result remains the same. The Eighth Circuit's case of *United States v. Smith,* is instructive. In *Smith,* local police and FBI agents were about to knock on a suspect's apartment door. 973 F.2d 1374, 1375 (8th Cir.1992). However, before any law enforcement officer knocked, a woman opened the door and the officers removed their firearms from their holsters. *Id.* The officers asked, and received, permission from the woman to enter the apartment. *Id.* After acknowledging that the officers withdrew their weapons when the woman opened the door, the court

stated "there was no evidence that [the officers] immediately demanded entry" and "[n]o physical force or threats were used by the officers at any time." *Id.* at 1376. The same is true here. When Duran opened the door in response to the knock, the officers did not demand entry or use physical force or threats. Duran's assent to the officers entry was voluntary.[3] *See United States v. Perez–Ruiz,* 322 Fed. Appx. 475, 477 (8th Cir.2009) ("While officers approached the truck with weapons drawn, removed Zamora's child from the area, and handcuffed Perez–Ruiz and Zamora, these actions do not preclude a finding of voluntariness.").

### 2. Search Warrant

■ Doran also objects to Judge Rau's finding that the search warrant was valid even if the evidence discovered as a result of the protective sweep was obtained unlawfully. Duran argues that if the results of the protective sweep are excised from the search warrant's probable cause basis, there is insufficient evidence to make a probable cause determination that supports issuance of the search warrant. Judge Rau's conclusion that the search warrant affidavit provided sufficient probable cause even if the initial McKnight Avenue apartment evidence was removed from the affidavit is sound.

■ The exclusionary rule "reaches not only primary evidence obtained as a direct result of an illegal search or seizure ... but also evidence later discovered and found to be derivative of an illegality or fruit of a poisonous tree." *Segura v. United States,* 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (internal quotation marks omitted). This doctrine, however, does not apply when the connection between the evidence to be excluded and the constitutional violation is "so at-

tenuated as to dissipate the taint." *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). This results when the Government shows that the evidence was acquired through an independent, untainted, source. *Wong Sun v. United States,* 371 U.S. 471, 487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ "A warrant obtained after an illegal search is not an independent source if either of the following are true: 'if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry,' and 'if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.'" *U.S. v. Swope,* 542 F.3d 609, 613 (8th Cir.2008) (quoting *Murray v. United States,* 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)). Thus, in order for the warrant to be an independent source, two questions must be answered in the affirmative: 1) would the police still have applied for the warrant absent the acquired tainted information, and 2) is the warrant still supported by probable cause after the tainted information has been removed from the warrant's supporting application? *Swope,* 542 F.3d at 613–14.

Even without knowledge of the evidence discovered during the protective sweep, the officers had sufficient basis to seek a search warrant of the McKnight Avenue apartment. While executing search warrants at the Maplewood addresses, officers discovered "a large amount of currency, drug ledgers, and a small amount of drugs," and "a digital scale that had [m]ethamphetamine residue on it." Tr. at 21–22. Reyes–Rojas, who was arrested while the Larpenteur address search warrant was being executed, was identified by

---

**3.** Duran does not object to Judge Rau's reasoning concerning the other relevant factors, including whether Duran's pivot and hand gesture was an invitation to enter.

a confidential reliable informant as someone very high up in the trafficking organization who was responsible for collecting the proceeds from the sale of narcotics. Rivas, who had driven Reyes–Rojas from the McKnight Avenue apartment, agreed to show law enforcement officers where that apartment was. At the McKnight Avenue apartment, officers believed an individual was driving around conducting counter-surveillance and the occupants of the apartment appeared concerned that they were being watched.

This evidence supports probable cause for the issuance of a search warrant for the McKnight Avenue apartment. Additionally, the search warrant affiant, Detective Brady Martin ("Martin"), while investigating a large-scale drug trafficking organization, became aware of the criminal activity that prompted issuance of the search warrants for the Maplewood addresses. As explained above, these warrants precipitated the series of events that led officers to believe criminal activity and likely evidence of narcotics trafficking was present in the McKnight Avenue apartment. The search warrant for the McKnight Avenue apartment was supported by more than adequate probable cause. Duran's motion is therefore denied.

### C. Motion to Suppress Statements

■■ Duran also objects to Judge Rau's recommendation that the Government satisfied its burden of showing Duran voluntarily waived his right to remain silent before speaking to Officer Freichels. In support of his position, Duran argues that he was handcuffed for over three hours before he was questioned. Duran also argues that Officer Aguirre is not a certified interpreter, the conversation was not recorded, an actual waiver was not signed, and Officer Aguirre did not testify at the motion hearing. None of Duran's objections support overruling Judge Rau's rec-

ommendation that Duran's motion be denied.

■■■■ The Fifth Amendment states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V. In *Miranda v. Arizona,* the Supreme Court adopted measures to ensure that a suspect is advised of their Fifth Amendment rights before interrogation. 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A defendant's waiver of his *Miranda* rights must be made voluntarily, knowingly, and intelligently. *Id.* at 444, 86 S.Ct. 1602. When determining whether a waiver was made voluntarily, knowingly, and intelligently, the court must determine whether:

> First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*United States v. Vinton,* 631 F.3d 476, 483 (8th Cir.2011) (internal citations omitted) (quoting *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). "The Government has the burden of proving the validity of the *Miranda* waiver by a preponderance of the evidence." *United States v. Haggard,* 368 F.3d 1020, 1024 (8th Cir.2004). A finding of police coercion is "a necessary prerequisite to a determination that a waiver was involuntary." *United States v. Turner,* 157 F.3d 552, 555 (8th Cir.1998) (emphasis omitted).

■■■■ In determining whether a waiver was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." *United States v. Syslo,* 303 F.3d 860, 866 (8th Cir.2002). In

considering the totality of the circumstances, a reviewing court must determine whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *United States v. Sanchez,* 614 F.3d 876, 883 (8th Cir.2010) (internal quotation marks and citations omitted). More specifically, the inquiry should focus on, among other things, "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id.* (citing *Sheets v. Butera,* 389 F.3d 772, 779 (8th Cir.2004)).

Duran first argues that his waiver was not voluntary because he opened his door to find four armed officers. As Judge Rau noted, *United States v. Havlik* dispels any notion that four officers entering the apartment, alone, makes Duran's subsequent statements involuntary. 710 F.3d 818 (8th Cir.2013). In *Havlik,* the Eighth Circuit concluded that the defendant's statements were voluntary even where a large number of officers had entered the defendant's property. *Id.* at 822–23. Also in *Havlik,* that three officers conducted the questioning did not amount to coercion. *Id.* Here, Duran spoke with only two officers, insufficient to create such an intimidating atmosphere to render his waiver involuntary. Furthermore, Duran being handcuffed when he waived his rights fails to compromise its voluntariness. *See United States v. Gaddy,* 532 F.3d 783, 786, 788–89 (8th Cir.2008) (finding waiver not involuntary when made with hands restrained behind back). Additionally, nothing in the record suggests that the location where the waiver occurred—the apartment's back bedroom—was inherently coercive or the officers created an intimidating atmosphere. *See United States v. Mims,* 567 F.Supp.2d 1059, 1079 (D.Minn. 2008) (concluding waiver was voluntary despite "[t]he fact that the interview took place in a windowless room" that the defendant was not allowed to exit from). Finally, Duran's three-hour detention while law enforcement officers waited for the warrant to arrive cannot be considered intimidating. There is no evidence that this delay was purposeful, or employed to erode ·Duran's confidence until he acquiesced to answering Officer Freichel's questions.

Duran next argues that because the *Miranda* warning was not recorded and Officer Aguirre is not a certified interpreter, there is no way to know if Officer Aguirre actually read Duran his rights or if his translation was accurate, especially since Officer Aguirre did not testify at the motion hearing. Judge Rau addressed these concerns in his R & R and concluded that they did not affect the propriety of Duran's waiver. Officer Freichels testified that he was present when Officer Aguirre read Duran his rights off a DEA card. While Officer Aguirre is not a certified interpreter, he grew up speaking Spanish with his ·family and has been a reliable interpreter in the past and is trusted by his fellow officers. After Officer Aguirre read the *Miranda* warning, Duran said he understood his rights and agreed to speak with Officer Freichels. During the approximately ten minute interview with Officer Freichels, Duran appeared calm, of average intelligence, provided coherent answers, and did not raise concerns of any medical issues that were impacting his ability to speak. That Officer Aguirre did not testify at the hearing does not act to rebut Officer Freichel's testimony. Judge Rau found Officer Freichel's testimony credible and there is no compelling evidence to the alternative. Nothing in the record can be reasonably construed to conclude that Duran was not read his rights or that Officer Aguirre's Spanish interpretation to Duran was erroneous.

Finally, Duran argues that since he did not sign a waiver or other document to confirm he understood his rights and voluntarily agreed to speak, his consent cannot be considered voluntary. However, a waiver can be made orally or in writing; it need not assume any particular form. *United States v. Zamarripa*, 544 F.2d 978, 981 (8th Cir.1976). Indeed, the Supreme Court has noted "that waiver is not a question of form, but of substance." *Thai v. Mapes*, 412 F.3d 970, 978 (8th Cir.2005) (citing *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)).

There is no evidence that Duran's statement was extracted through overt, coercive acts of the arresting or interrogating officers. Nor is there any evidence suggesting that Duran was lured into speaking through direct or implied promises. To the contrary, Duran's decision to speak with Officer Freichels was voluntary, knowing, and intelligent. For these reasons, Duran's motion is denied.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Jesus Rubio Duran's Objections [Docket No. 86] to Magistrate Judge Steven E. Rau's April 21, 2015 Report and Recommendation [Docket No. 85] are **OVERRULED;**

2. The Report and Recommendation [Docket No. 85] is **ADOPTED;**

3. Defendant's Motion to Suppress Physical Evidence [Docket No. 51] is **DENIED;** and

4. Defendant's Motion to Suppress Statements [Docket No. 52] is **DENIED.**

## REPORT AND RECOMMENDATION

STEVEN E. RAU, United States Magistrate Judge.

The above-captioned case came before the undersigned on Defendant Jesus Rubio Duran's ("Duran") Motion to Suppress Physical Evidence [Doc. No. 51] and Motion to Suppress Statements [Doc. No. 52] (collectively, the "Motions to Suppress"). This matter was referred for the resolution of the issues raised in Duran's Motions to Suppress pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, the Court recommends that the Motions to Suppress be denied.

## I. BACKGROUND

On December 1, 2014, a grand jury indicted Duran and co-defendants Alejandro Reyes–Rojas ("Reyes–Rojas") and Jose Luis Valencia ("Valencia") with one count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. (Indictment) [Doc. No. 25 at 1]. Reyes–Rojas and Duran were also charged with one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (*Id.* at 2).

Reyes–Rojas did not file pretrial motions and pleaded guilty on February 4, 2015. (Letter to Mag. Judge Dated Dec. 22, 2014) [Doc. No. 49]; (Minute Entry Dated Feb. 4, 2015) [Doc. No. 70]. Valencia withdrew his pretrial motions. (Letter to Mag. Judge Dated Feb. 20, 2015) [Doc. No. 72]. Duran filed several pretrial motions, and a hearing was held on February 23, 2015. (Minute Entry Dated Feb. 23, 2015) [Doc. No. 73]. Sergeant Burt Emerson ("Sergeant Emerson") and Officer Christian Freichels ("Officer Freichels") testified on behalf of the Government, and the Court received one exhibit, a search

warrant, into evidence. (Ex. & Witness List) [Doc. No. 74]. The parties submitted supplemental briefing. *See* (Minute Entry Dated Feb. 23, 2015). The Court issued an order on Duran's non-dispositive motions, and took Duran's Motions to Suppress under advisement on March 24, 2015. *See* (*id.*);[1] (Order Dated Feb. 25, 2015) [Doc. No. 76].

## II. FACTS [2]

On November 5, 2014, Officer Freichels and other law enforcement officers executed search warrants at addresses on Nebraska Avenue and Larpenteur Avenue in Maplewood, Minnesota.[3] (Tr. at 21). As a result of the search warrant executed on Nebraska Avenue, the officers discovered "a large amount of currency, drug ledgers, and a small amount of drugs." (*Id.*). The execution of the Larpenteur Avenue search warrant yielded "a digital scale that had [m]ethamphetamine residue on it." (*Id.* at 21–22). During the Larpenteur Avenue search, Reyes–Rojas, who was previously unknown to law enforcement, entered the apartment. (*Id.* at 22, 32). Law enforcement officers' investigation suggested Reyes–Rojas entered the apartment to pick up drug proceeds. (*Id.* at 24). The officers arrested and searched Reyes–Rojas but did not find any drugs or guns. (*Id.* at 32); *see also* (*id.* at 23). He had been driven to that location by a Mr. Rivas ("Rivas"). (*Id.* at 22). Officers searched Rivas's vehicle and did not find any drugs or guns. (*Id.* at 32). After speaking to Reyes–Rojas and Rivas, officers determined that they had come from an apartment on McKnight Avenue, and Rivas agreed to show the officers where the apartment was located. (*Id.* at 22). The McKnight Avenue apartment was Reyes–Rojas's apartment. (*Id.* at 23). Rivas identified a man who was driving around in the parking lot near the McKnight Avenue apartment as a person who had come from the McKnight Avenue apartment. (*Id.* at 22–23). Sergeant Emerson, who was conducting surveillance on the McKnight Avenue apartment at the direction of Officer Freichels, believed that the individual driving around in the parking lot was waiting for someone or conducting counter-surveillance, meaning he was looking for signs of someone conducting surveillance on the apartment. (*Id.* at 7–8, 10–11); *see also* (*id.* at 22–23).

Officer Freichels was concerned that Reyes–Rojas's associates may learn that Reyes–Rojas was arrested. *See* (*id.* at 23). Additionally, the occupants of the McKnight Avenue apartment appeared concerned that they were being watched. (*Id.*). A person who was cooperating with law enforcement in this investigation previously told Officer Freichels that if members of the drug trafficking organization ("DTO") learned or suspected that one of their associates was arrested or unreachable, the DTO members may "try to remove or destroy evidence." (*Id.* at 23–24). For these reasons, Officer Freichels believed "time was of the essence" because evi-

---

1. The Court anticipated taking the Motions to Suppress under advisement on March 23, 2015. (Minute Entry Dated Feb. 23, 2015). But because the Government filed its brief one day late, the Motions to Suppress were taken under advisement on March 24, 2015. *See* (Gov't's Resp. to Def.'s Mem. in Supp. of Mots. to Suppress, "Gov't's Resp.") [Doc. No. 82].

2. The facts presented in this section are drawn from the testimony at the hearing. *See*

*generally* (Tr. Dated Feb. 23, 2015, "Tr.") [Doc. No. 79]. Some of these facts contradict or are supplemented by those facts in the affidavit submitted in support of the search warrant, which are described separately in the context of the probable cause analysis for the search warrant. *See* (Gov't's Ex. 1); Part III.B.2.a., *infra*.

3. The testimony is unclear regarding the city in which Nebraska Avenue is located.

dence in the McKnight Avenue apartment may be lost if law enforcement officers did not "obtain a search warrant or go knock at the door immediately." (*Id.* at 23). Freichels ordered investigators to knock on the door of the McKnight Avenue apartment. (*Id.* at 23, 25). The investigators included Sergeant Emerson, Commander Richard Clark ("Commander Clark"), Investigator Chris Tayson ("Investigator Tayson"), and Investigator John Ferrian ("Investigator Ferrian"), who had been conducting surveillance with Sergeant Emerson. (*Id.* at 8, 11).

The investigators were wearing street clothes and vests that either said "police" or "sheriff" on both the front and back. (*Id.* at 18). Their badges were visible, but Sergeant Emerson could not recall whether he or any of the other officers had their weapons drawn. (*Id.*). One of the officers knocked on the door, which was opened by Duran. (*Id.* at 12). At that point, law enforcement officers working on the investigation did not know anything about Duran. (*Id.* at 34). Commander Clark asked Duran something along the lines of "May we come in?" or "[D]o you mind if we come in?" or "Can we come inside and talk?" (*Id.* at 13, 19). Duran was standing in the doorway, and in response to Commander Clark's question, "pivoted on his foot to the side while raising one arm, sort of [at] waist level[.]" (*Id.* at 13–14). Sergeant Emerson interpreted this gesture to be an invitation to enter the apartment. (*Id.* at 14).

When the investigators entered the apartment, they saw the same person who officers believed was conducting counter-surveillance in the living room. (*Id.*). Investigators Tayson and Ferrian stayed with this individual while Sergeant Emer-

son and Commander Clark conducted a protective sweep. (*Id.* at 14–15). The protective sweep consisted of checking "the bedroom and the bathroom just to make sure no one else was in the apartment" because they knew very little information about the apartment and drug traffickers frequently have weapons. (*Id.* at 15). During the sweep, Sergeant Emerson and Commander Clark saw, in plain view in the bedroom, a "bag of drug packaging materials that was consistent with the previous investigation." (*Id.* at 15);[4] *see also* (*id.* at 25). Sergeant Emerson provided this information to Officer Freichels, and then "froze" the apartment, meaning the officers ensured that no one destroyed evidence, that there were no weapons, and that no one went into or out of the apartment until a search warrant was obtained. (*Id.* at 15); *see also* (*id.* at 11). Duran and the other occupant were handcuffed and waited with the officers. (*Id.* at 15–16). None of the officers conducted any additional searches during this time. (*Id.*).

Officer Freichels obtained a search warrant from a Ramsey County District Court judge that authorized a search of the McKnight Avenue apartment. (*Id.* at 26); *see* (Gov't's Ex. 1). Officer Freichels, who was wearing street clothes and carrying a concealed weapon, executed the search warrant between 6:00 p.m. and 6:30 p.m. that day and found approximately two pounds of methamphetamine. (*Id.* at 27, 30, 35). He asked for a Spanish-speaking law enforcement officer to come to the apartment because he wanted to interview Duran, who did not speak English. (*Id.* at 27–28, 36–37). Officer Freichels, Officer Aguirre, the Spanish-speaking officer, and Duran spoke in the back bedroom. (*Id.* at 29).[5] Officer Aguirre read Duran a stan-

---

**4.** It is not clear from the testimony whether "the previous investigation" refers to the search warrants executed earlier that day, or some other investigation. *See* (*id.* at 15).

**5.** Although Officer Aguirre is not a certified interpreter, he grew up speaking Spanish with his family. (Tr. at 37). Officer Aguirre

dard DEA card containing *Miranda* warnings in Spanish. (*Id.* at 28–29). Although he did not sign a waiver, Duran said that he understood his rights, and he agreed to talk to Officer Freichels. (*Id.* at 28–29, 37).

During the interview, Duran acknowledged that he knew methamphetamine was in the apartment. (*Id.* at 29). He denied being involved in selling drugs, but admitted that he deposited money into Wells Fargo bank accounts under the direction of Reyes–Rojas. (*Id.* at 29–30). When Officer Freichels attempted to get more information about depositing money, Duran declined to answer those questions. (*Id.* at 30). The conversation lasted ten minutes, and Duran was calm throughout and did not raise his voice or have any emotional outbursts. (*Id.* at 30–31). Officer Freichels did not raise his voice or draw his weapon. (*Id.* at 30). Officer Freichels believed Duran to be of average intelligence; Duran provided coherent answers, and did not mention any type of medical problem. (*Id.* at 31).

### III. MOTION TO SUPPRESS PHYSICAL EVIDENCE

Duran argues that the officers' initial warrantless entry into the apartment was not justified by voluntary consent or exigent circumstances. (Def.'s Mem. of Law in Supp. of Mots. to Suppress, "Duran's Mem. in Supp.") [Doc. No. 80 at 5–8]. Thus, Duran argues that any items observed during the protective sweep should not have been included in the search warrant. (*Id.* at 8–9). Absent those items, Duran argues the search warrant is not supported by probable cause. (*Id.*).

#### A. Legal Standard

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. " 'Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *United States v. Brown,* 634 F.3d 435, 438 (8th Cir.2011) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

"A defendant's voluntary consent to be searched is an exception to the Fourth Amendment's warrant requirement." *United States v. Esquivias,* 416 F.3d 696, 700 (8th Cir.2005) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). "[A] consent to a search is voluntary unless, in light of all the circumstances, pressures exerted upon the suspect have overborne his will." *United States v. Magness,* 69 F.3d 872, 874 (8th Cir.1995) (internal quotation marks omitted). "[T]he Fourth Amendment requires only that the police reasonably believe the search to be consensual." *United States v. Cedano–Medina,* 366 F.3d 682, 685 (8th Cir.2004) (internal quotation marks omitted). When determining whether consent was voluntary, a court considers four factors related to the individual:

(1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his or her] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals.

*United States v. Golinveaux,* 611 F.3d 956, 959 (8th Cir.2010) (internal quotation

---

has been a reliable interpreter in the past and is trusted by his fellow officers. (*Id.* at 40).

marks omitted). A court also considers six environmental factors:

(1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*Id.* (internal quotation marks omitted). The voluntary consent inquiry focuses on what an officer reasonably believes, rather than an individual's subjective intent regarding whether he gave consent. *Cedano–Medina,* 366 F.3d at 685. Additionally, "a person can render a search legal by behaving in a way that would cause a reasonable person to believe that he or she has knowingly and voluntarily consented, whether or not the person actually intends to consent." *Id.* at 684–85.

In determining if probable cause exists to authorize a search warrant, a court considers the information that was before the issuing magistrate judge and affords "great deference to the issuing judge's determination." *United States v. Smith,* 581 F.3d 692, 694 (8th Cir.2009). Where no evidence outside of the affidavit was submitted to the issuing judge, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon,* 432 F.3d 824, 827 (8th Cir.2005) (internal quotation marks omitted). Probable cause exists when the likelihood of finding evidence of a crime in a certain place is fairly probable. *United States v. Chrobak,* 289

F.3d 1043, 1046 (8th Cir.2002). Moreover, "'[t]he source and credibility of evidence in support of a warrant request is considered in the totality of the circumstances analysis, and a warrant is proper so long as the evidence as a whole creates a reasonable probability that the search will lead to the discovery of evidence.'" *Id.* (quoting *United States v. Horn,* 187 F.3d 781, 786 (8th Cir.1999)).

## B. Analysis

### 1. Entry into the McKnight Avenue Apartment

Duran argues his consent to police officers entering the McKnight Avenue apartment was not voluntary because the four police officers were wearing vests or jackets that said "police" or "sheriff" on the front, and because Commander Clark did not speak to him in Spanish. (Duran's Mem. in Supp. at 6). The Court finds that, under the totality of the circumstances, Duran voluntarily consented to the police entering the apartment.

In light of the factors described above, the only factor that weighs against finding Duran's consent was voluntary is that he was not read his *Miranda* rights. But because the Eighth Circuit does not require a suspect to be given *Miranda* warnings in order to find consent to enter voluntary, the absence of a *Miranda* warning is not dispositive. *See United States v. Saenz,* 474 F.3d 1132, 1137 (8th Cir.2007) ("We have not required an officer to provide *Miranda* warnings before requesting consent to search or held that an absence of *Miranda* warnings would make an otherwise voluntary consent involuntary.").[6]

The record does not reflect any facts that can aid the Court in determining

---

**6.** Courts evaluate whether consent to enter was voluntary using the same factors as whether consent to search was voluntary. *Compare United States v. Lindsey,* Crim. No.

10–15 (JNE/JJK), 2010 WL 4822939, at *23 (D.Minn. July 20, 2010), *adopted in relevant part by* 2010 WL 4822925 (Nov. 22, 2010) *with Golinveaux,* 611 F.3d at 959.

whether Duran was aware of the legal system's protection for suspected criminals through prior experience and whether the consent was given in a public location. Therefore, these factors are neutral.

The remaining seven factors weigh in favor of finding that Duran's consent was voluntary. Duran is of average intelligence, was not experiencing any medical issues, and did not appear to be under the influence of any drugs. (Tr. at 31). Duran was not detained, and the police did not use threats, physical intimidation, or punishment to extract consent. The police did not make any promises or misrepresentations, and at the time Duran consented, he was not in custody or under arrest. Finally, there is no testimony or other evidence that he objected to the search.

The fact that Commander Clark spoke to Duran in English, instead of his native Spanish, is not dispositive. When asked if the officers could enter, Duran responded by "pivot[ing] on his foot to the side while raising one arm, sort of [at] waist level," which the officer interpreted as an invitation to enter the apartment. (*Id.* at 13–14). The voluntary consent inquiry focuses on what an officer reasonably believed, not Duran's subjective intent. *See Cedano–Medina*, 366 F.3d at 685. "[A] person can render a search legal by behaving in a way that would cause a reasonable person to believe that he or she has knowingly and voluntarily consented, whether or not the person actually intends to consent." *Id.* at 684–85. Here, Duran's gesture was reasonably interpreted as permission to enter the apartment.

After considering all of the circumstances, the Court finds Duran consented to the officers' entry into the apartment.[7]

### 2. Issuance of Search Warrant

Duran argues that evidence obtained unlawfully—the observation of large amounts of U.S. currency and materials commonly used to package methamphetamine in the McKnight Avenue Apartment—was used to support a finding of probable cause to issue the search warrant. (Duran's Mem. in Supp. at 8–9).[8] Absent the unlawfully obtained evidence, Duran argues the search warrant is not supported by probable cause because "[t]here had been no observations of illegal activity at the [McKnight Avenue] apartment, law enforcement had never observed that apartment previously, and there was no contraband found on Mr. Reyes–Rojas or the vehicle that drove him to the apartment on Larpenteur Avenue." (*Id.* at 8–9).

7. The Government bears the burden of showing that a legitimate exception to the warrant requirement applies. *United States v. Kelly*, 529 F.2d 1365, 1371 (8th Cir.1976). The Government initially argued that the officers' entry into the McKnight Avenue apartment was justified by exigent circumstances. (Gov't's Omnibus Resp. to Def.'s Pretrial Mots.) [Doc. No. 68 at 1]. But because the Government did not address this issue in its supplemental brief, the Court does not address it. *See* (Tr. at 42) (advising the parties that issues not "identified and supported" in supplemental briefing will not be addressed in the Court's Report and Recommendation); *cf.* (Duran's Mem. in Supp. at 6–8) (arguing the exigent circumstances exception to the warrant requirement does not apply).

8. Sergeant Emerson testified that he saw drug packaging materials, but did not testify that he saw U.S. currency, which is described in the search warrant as "a large amount." *See* (Tr. at 15, 25); (Gov't's Ex. 1 at 4). Both Duran and the Government state that the officers saw U.S. currency. (Duran's Mem. in Supp. at 9); (Gov't's Resp. at 11). Because neither party challenges whether U.S. currency was at the McKnight Avenue apartment, the Court includes it in this Report and Recommendation. The search warrant reflects that the officers also observed money transfer slips and multiple cell phones. (Gov't's Ex. 1 at 4).

■■■ As addressed above, the Court finds the officers lawfully entered the McKnight Avenue apartment following Duran's voluntary consent. Once inside, the officers conducted a protective sweep of the apartment.[9] (Tr. at 15). As a result of the protective sweep, the officers observed drug packing material and a large amount of U.S. currency in plain view.[10] (*Id.* at 14–15, 25); (Gov't's Ex. 1 at 4). These items were described in the search warrant. (Gov't's Ex. 1 at 4). Because Duran consented to the officers entering the apartment, the protective sweep was lawful, and the officers observed the drug packaging materials and currency lawfully, they were permitted to include a description of the items in the search warrant application.

Duran's other arguments that the currency and drug packaging materials must be excluded from the search warrant are unavailing. First, Duran argues that these items must be excluded from the search warrant because Detective Brady Martin ("Detective Martin"), the affiant, does not have any personal knowledge of the information gained during the initial search of the McKnight Avenue apartment. (Duran's Mem. in Supp. at 8–9). "[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication" among the officers. *United States v. Horne,* 4 F.3d 579, 585 (8th Cir. 1993). Therefore, the officers' information about their observations of a large amount of money and drug packaging materials from the McKnight Avenue apartment was communicated to Detective Martin, who included the information in the search warrant properly. *See id.*

9. Duran does not separately challenge the legality of the protective sweep, and therefore, the Court does not address it. *See* (Duran's Mem. in Supp. at 5–8). Nonetheless, the Court finds the protective sweep was lawful because based on the facts available to the officers and rational inferences, there was a reasonable probability that other individuals were in the apartment that may pose a danger to the officers. *United States v. Cisneros–Gutierrez,* 598 F.3d 997, 1006 (8th Cir.2010) (stating that law enforcement officers may conduct a protective sweep of a residence when they have " 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene' " (quoting *Maryland v. Buie,* 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990))); *see also United States v. Crisolis–Gonzalez,* 742 F.3d 830, 836 (8th Cir.2014) (finding that circumstances demonstrated that law enforcement understood that there was a reasonable probability that the residence "harbored dangerous individuals" and finding the protective sweep lawful); (Tr. at 15) (Sergeant Emerson testify-

ing as follows: "We didn't have a lot of intel on this apartment. We didn't know if there was going to be more people in there. And based on what had led us up to that point in the investigation, the nature of the investigation, drug traffickers frequently have weapons and we just want to make sure no one else was in the apartment.").

10. Duran does not separately challenge the legality of the police describing in the search warrant affidavit items they discovered in plain view. *See* (Duran's Mem. in Supp. at 5–8). Nonetheless, the Court finds that, because the officers lawfully entered the premises based on Duran's voluntary consent and lawfully conducted a protective sweep, officers lawfully used the items they viewed in plain sight in their search warrant application. *See Fagnan v. City of Lino Lakes, Minn.,* 745 F.3d 318, 323–24 (8th Cir.2014) (finding description of items in plain view contributed to probable cause to issue subsequent search warrant); *United States v. Schmidt,* 662 F.2d 498, 504 (8th Cir.1981) (finding that items observed in plain view during a traffic stop, along with other information, contributed to probable cause to issue a search warrant).

Duran also argues that "the credibility of Det[ective] Martin's averments in the search warrant application are questionable, at best" because Sergeant Emerson's testimony "that nothing was found during the initial search contradicts the averments made in Det[ective] Martin's search warrant application." (Duran's Mem. in Supp. at 9). As an initial matter, Sergeant Emerson did not testify that "nothing was found"; instead, he testified that drug packaging material was found in plain sight during the protective sweep. (Tr. at 15, 25). Additionally, no party argues that the issuing judge considered any other evidence outside Detective Martin's affidavit when signing the search warrant. Therefore, this Court can likewise only consider Detective Martin's affidavit.[11] See Solomon, 432 F.3d at 827.

For the foregoing reasons, the Court concludes that the description of the drug packaging materials and money was lawfully included in the search warrant application.

Duran does not challenge probable cause if, as the Court finds here, the drug packaging materials and the money were lawfully included in the search warrant. See generally (Duran's Mem. in Supp.). Therefore, the Court's analysis is complete. Nonetheless, the Court analyzes whether probable cause exists even if the description of money and drug packaging materials was excised from the search warrant, as Duran argues. See United States v. Hernandez Leon, 379 F.3d 1024, 1027 (8th Cir.2004) ("The sufficiency of a warrant affidavit which contains information from an unlawful search is evaluated

after deleting that information."); (Duran's Mem. in Supp. at 9).

### a. Search Warrant Affidavit

The search warrant affidavit, signed by Detective Martin, describes the following:[12] Through Detective Martin's investigation into a large-scale DTO, he became aware that Valencia, who resided on Larpenteur Avenue in Maplewood, was an individual responsible for delivering drugs for Veronica Hernandez, the leader of the DTO. He also learned of Jorge Luis Meza Cabrera ("Meza Cabrera"), another delivery person, who resided on Highway 36 West in Roseville. Meza Cabrera was eventually arrested and a search warrant executed at his residence lead to the discovery of twenty-two pounds of methamphetamine and cocaine, as well as $20,000. Meza Cabrera pleaded guilty to federal drug charges.

On November 5, 2014, Detective Martin executed a search warrant at Valencia's residence, where he discovered $80,000 arranged in a manner consistent with narcotics trafficking and "notes detailing drug transactions and money transfers" in the same box. During the execution of the search warrant, Reyes–Rojas arrived, and Valencia told Detective Martin that Reyes–Rojas was there to pick up $10,000 for drugs. After viewing a picture of Reyes–Rojas, a confidential reliable informant ("CRI") advised Detective Martin that "Reyes[-]Rojas was very high up in the DTO and was responsible for picking up United States Currency from the sale of narcotics."

---

**11.** Nothing in Duran's memorandum suggests that he is challenging the search warrant under *Franks*, which is a challenge grounded in the argument "that the probable cause determination relied on an affidavit containing false statements or omissions made knowingly and intentionally or with reckless disregard for the truth." *United States v. Snyder*, 511

F.3d 813, 816 (8th Cir.2008) (citing, *inter alia*, *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).

**12.** The facts in this section are found on pages 2 through 4 of the affidavit in support of the search warrant, Government's Exhibit 1.

Detective Martin learned that Reyes–Rojas was driven to Valencia's apartment by Rivas. Based on a probable cause search of Rivas's vehicle, law enforcement officers found two empty boxes for scales and money transfer receipts. Detective Martin noted that scales are often used by narcotics traffickers to measure narcotics, especially methamphetamine, and that this particular DTO uses money transfers to send its proceeds to supply sources in Mexico.

Rivas offered to show Detective Martin where he picked up Reyes–Rojas, which was the apartment on McKnight Road. Rivas identified a male driving around the apartment as the same man Rivas saw in the apartment earlier. Investigators knocked on the apartment door, and two Hispanic males, who were unknown to law enforcement officers at the time, permitted the officers to enter the apartment.

Detective Martin stated that he believed the McKnight residence was being used to store drugs and money, and that if Reyes–Rojas does not answer his phone, coconspirators will destroy evidence. The CRI said that members of the DTO will remove or destroy evidence if a coconspirator is arrested. Detective Martin stated that it is common for drug traffickers to use their residences to hide evidence of their business.

#### b. Probable Cause

The Court finds the search warrant affidavit supports a finding of probable cause even if the information about the items observed inside the McKnight Avenue apartment are removed from the affidavit. The affidavit establishes Detective Martin's familiarity with the DTO at issue, and that Valencia is involved. (Gov't's Ex. 1 at 2). A search warrant at Valencia's residence led to the discovery of a large amount of money, stored in a manner consistent with narcotics trafficking, as well as notes regarding drug transactions and

money transfers. (*Id.* at 3). Valencia identified Reyes–Rojas as an individual who was at his (Valencia's) apartment to pick up drug money, and the CRI confirmed that Reyes–Rojas is responsible for picking up the money made from the sale of narcotics. (*Id.* at 3–4). The CRI also stated that Reyes–Rojas is "high up" in the DTO. (*Id.* at 4). Rivas, who drove Reyes–Rojas to Valencia's apartment, had empty boxes for scales and money transfer receipts in his car, and both items are associated with drug trafficking. (*Id.* at 3). In other words, a high-ranking individual in the DTO traveled from the McKnight Avenue apartment in a vehicle that contained evidence of drug trafficking to the apartment of a known drug trafficking delivery person, and was there to pick up money earned through drug trafficking. *See* (*id.* at 3–4). Based on these circumstances, the Court finds the search warrant affidavit created "a reasonable probability that the search will lead to the discovery of evidence" of crime at the McKnight Avenue apartment. *U.S. v. Chrobak,* 289 F.3d 1043, 1046 (8th Cir. 2002) (internal quotation marks omitted).

For the foregoing reasons, the Court finds that, even if the information regarding the items observed in plain view are excised from the search warrant, it is still supported by probable cause.

#### 3. Conclusion

The Court finds that law enforcement officers lawfully entered the McKnight Avenue apartment following Duran's voluntary consent. While conducting a protective sweep, they discovered, in plain view, a large amount of money and drug packaging materials. *See* (Tr. at 15, 25). The inclusion of this information in the affidavit in support of a search warrant for the McKnight Avenue apartment was proper.

Even if the information about the large amount of money and drug packaging ma-

terials was removed from the affidavit, the affidavit provided sufficient probable cause to issue the search warrant. The Court therefore recommends that Duran's Motion to Suppress Physical Evidence be denied.

## IV. MOTION TO SUPPRESS STATE-MENTS [13]

Duran argues that his waiver of his right to an attorney was not voluntary because of the police-dominated environment, because he was in handcuffs for three hours before the interview began, and because he was intimidated by the fact that only Officer Freichels and Officer Aguirre were in the bedroom with him. (Duran's Mem. in Supp. at 11). He also argues he cannot confirm whether Officer Aguirre, "who is not a certified interpreter," read him his rights or did so accurately because the conversation was not recorded, because Duran did not sign any document confirming that he was read his rights, and because Officer Aguirre did not testify at the motion hearing. (*Id.*).

### A. Legal Standard

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court adopted measures to ensure that a suspect is advised of his or her Fifth Amendment rights before custodial interrogations. 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Consequently, "*Miranda ...*

prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir.2005) (citing *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602).

"[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (internal quotation marks omitted). If a waiver is "made with full understanding of the nature of the right being abandoned and the resulting consequences of abandoning the right[,]" the waiver is knowing. *United States v. Soto*, No. 07–CR–0223 (PJS/JSM), 2007 WL 3120816, at *13 (D.Minn. Oct. 23, 2007) (citing *United States v. Bell*, 477 F.3d 607, 612 (8th Cir. 2007)). " 'A statement is not voluntary if the totality of the circumstances shows the defendant's will was overborne,' and voluntary statements must not be the result of deception, intimidation, or coercion of the person giving the statement." *United States v. Jimenez*, 478 F.3d 929, 932–33 (8th Cir.2007) (quoting *United States v. Annis*, 446 F.3d 852, 855 (8th Cir.2006)).[14]

---

13. Duran argues that "if this Court determines that the initial entry and subsequent search of the apartment was unlawful, then any statements subsequently made by [Duran] must also be suppressed because they are fruits of the illegal search." (Duran's Mem. in Supp. at 10). Because the Court finds the entry into the McKnight Avenue apartment and subsequent search was lawful, the Court does not address this argument.

14. The analysis of whether a waiver of rights is voluntary and whether statements were made voluntarily "is essentially the same." *United States v. Havlik*, 710 F.3d 818, 822 (8th Cir.2013) (citing *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)).

A finding of police coercion is "a necessary prerequisite to a determination that a waiver was involuntary." *United States v. Turner,* 157 F.3d 552, 555 (8th Cir.1998) (emphasis omitted).

 The Court considers both "(1) the conduct of the law enforcement officials in creating pressure; and (2) the suspect's capacity to resist that pressure." *United States v. Aguilar,* Criminal No. 06–CR–396 (RHK/SRN), 2007 WL 902572, at *9 (D.Minn. Feb. 22, 2007), *report and recommendation adopted by* 2007 WL 1116843 (Apr. 13, 2007). A court should consider the defendant's "age, education, intelligence, advice of constitutional rights, the length of the detention and questioning, and psychological impact." *Soto,* 2007 WL 3120816, at *14 (citing *Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041).

"The government has the burden of proving the validity of the *Miranda* waiver by a preponderance of the evidence." *United States v. Haggard,* 368 F.3d 1020, 1024 (8th Cir.2004).

**B. Analysis**

Considering the totality of these circumstances, the Court finds Duran's waiver was voluntary, knowing, and intelligent. Duran appears to argue that four armed officers knocking on his door was intimidating. (Duran's Mem. in Supp. at 11). In a similar situation, the Eighth Circuit found that a defendant's waiver of his right to counsel and his post-*Miranda* statement were both voluntary when, *inter alia,* a large group was present to execute the search warrants but only three officers questioned the defendant. *Havlik,* 710 F.3d at 822–23. Additionally, the fact that only Officers Freichels and Aguirre interviewed Duran does not, by itself, demonstrate coercion or intimidation. *See United States v. Mims,* 567 F.Supp.2d 1059, 1079 (D.Minn.2008) (JMR/JSM) (finding that "[t]he fact that the interview took place in a windowless room, and that she was not free to exit the room or was not given access to a phone did not amount to coercive conduct on the part of the officers such that this Court could conclude that [the defendant's] will was overborne") (citing *United States v. LeBrun,* 363 F.3d 715, 722–23 (8th Cir.2004); *United States v. Galceran,* 301 F.3d 927, 930–31 (8th Cir. 2002)); *see* (Tr. at 29).

Similarly, the fact that Duran was handcuffed does not demonstrate that his waiver was involuntary. *See United States v. Carranza,* 39 Fed.Appx. 464, 465 (8th Cir. 2002) (affirming district court finding that defendant's waiver of right to counsel was voluntary when he was adequately advised of his *Miranda* rights, even though he was "apprehended and handcuffed at gunpoint"). Finally, the length of time that Duran was detained—three hours—is not so long as to be considered intimidating. Thus, nothing in the record demonstrates that Duran's will was overborne, much less by deception, intimidation, or coercion. *See Jimenez,* 478 F.3d at 932–33; *cf. United States v. Liu,* Criminal No. 08–15 (ADM/FLN), 2008 WL 1994977, at *16 (D.Minn. Apr. 7, 2008) (finding the defendant's "waiver of his *Miranda* rights was obtained through intimidation and coercion" when defendant was promised that "if he cooperated, then he would not spend the night in jail").

Duran challenges Officer Freichels's credibility, arguing that he "has no way of knowing if [Duran] was read his *Miranda* warning [or] to confirm the accuracy of Off[icer] Aguirre's translation." (Duran's Mem. in Supp. at 11).

The Government bears the burden of showing, by a preponderance of the evidence, that Duran's waiver is valid. *Haggard,* 368 F.3d at 1024. To that end, the Government presented the testimony of Officer Freichels. Officer Freichels testi-

fied that he was present when Officer Aguirre read Duran his *Miranda* rights, and that Officer Aguirre used a DEA card to read Duran his *Miranda* rights in Spanish. (*Id.* at 28–29). Officer Aguirre's use of a DEA card suggests that the recitation was accurate. Officer Freichels testified that Officer Aguirre grew up speaking Spanish with his family, has been a reliable interpreter in the past, and is trusted by his fellow officers. (*Id.* at 37, 40). Duran said that he understood his rights, and he agreed to speak with Officer Freichels. (*Id.* at 28–29, 37). Throughout the interview, which lasted only ten minutes, Duran was calm and appeared to be of average intelligence. (*Id.* at 30–31). His answers were coherent, and he did not mention that he was having any medical issue that may impact his ability to speak to Officer Freichels. (*Id.* at 31). The Court finds the Government has satisfied its burden of demonstrating that Duran's waiver is valid based on Officer Freichels's testimony as described above. The Court finds Officer Freichels's testimony credible, and nothing in the record suggests a finding to the contrary.[15]

For the foregoing reasons, the Court recommends that Duran's Motion to Suppress Statements be denied.

## V. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that

1. Defendant Jesus Rubio Duran's ("Duran") Motion to Suppress Physical Evidence [Doc. No. 51] be **DENIED;** and

2. Duran's Motion to Suppress Statements [Doc. No. 52] be **DENIED.**

Dated: April 21, 2015.

---

**15.** *See United States v. Spencer*, Crim. No. 12–280 (MJD/JJK), 2012 WL 6778520, at *1 n. 1 (D.Minn. Dec. 14, 2012) (noting that reliable hearsay evidence is properly relied upon in the context of a motion to suppress hearing) *report and recommendation adopted by* 2013 WL 68635 (Jan. 7, 2013).