# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2980

_____

United States of America,          *
                                   *
        Appellee,                *
                                   *  Appeal from the United States
    v.                             *  District Court for the District
                                   *  of Nebraska.
Dagoberto Servero Cedano-Medina,   *
                                   *
        Appellant.               *

_____

Submitted:  February 10, 2004

Filed:  April 30, 2004

_____

Before MORRIS SHEPPARD ARNOLD, HANSEN, and SMITH, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

While driving across Nebraska, Dagoberto Cedano-Medina was pulled over by Nebraska State Patrol Trooper Jeffrey Roby for driving onto the shoulder of the highway. The two men talked for several minutes, culminating in a minute-long interchange in which Trooper Roby repeatedly asked Mr. Cedano-Medina if he could search his truck. After receiving a number of varying responses, Trooper Roby searched the truck and discovered seventeen pounds of cocaine hidden in the dash area. Mr. Cedano-Medina's primary language is Spanish. He spoke broken English throughout his encounter with Trooper Roby, and the two men had difficulty communicating and understanding each other during part of their discussion.

Mr. Cedano-Medina was indicted for possessing cocaine with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). He filed a motion to suppress the cocaine that was found in his truck, contending that Trooper Roby did not obtain his voluntary consent before conducting the search. In denying the suppression motion, the district court[1] found that the government had proved by a preponderance of the evidence that it was reasonable to believe that Mr. Cedano-Medina knowingly and voluntarily consented to the search of his truck. Mr. Cedano-Medina conditionally pleaded guilty to the drug charge, reserving the right to appeal the denial of his motion to suppress. Reviewing the district court's finding for clear error, *see United States v. Carrate*, 122 F.3d 666, 669 (8th Cir. 1997), we affirm.

I.

Under the fourth and fourteenth amendments, searches conducted without a warrant issued upon probable cause are presumptively unreasonable, subject to a few specifically established exceptions. *See Katz v. United States*, 389 U.S. 347, 356-57 (1967). A search that is consented to is one of those exceptions. Thus, "[a] warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to a search." *United States v. Brown*, 763 F.2d 984, 987 (8th Cir. 1985), *cert. denied*, 474 U.S. 905 (1985). The government has the burden of proving by a preponderance of the evidence that a subject's alleged consent to a search was legally sufficient to warrant admitting the fruits of the search into evidence. *See United States v. Matlock*, 415 U.S. 164, 177 (1974). This burden " 'is not satisfied by showing a mere submission to a claim of lawful authority.' " *United States v. $404,905 in U. S. Currency*, 182 F.3d 643, 649 n.3 (8th Cir. 1999) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion)). Rather, the government must show that a reasonable person would have believed, *see United*

---

[1]The Honorable Richard G. Kopf, Chief Judge, United States District Court for the District of Nebraska, adopting the recommendation of the Honorable David L. Piester, United States Magistrate Judge for the District of Nebraska.

*States v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998), that the subject of a search gave consent that was "the product of an essentially free and unconstrained choice," *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973), and that the subject comprehended the choice that he or she was making.

In other words, a person can render a search legal by behaving in a way that would cause a reasonable person to believe that he or she has knowingly and voluntarily consented, whether or not the person actually intends to consent. Thus, "the Fourth Amendment requires only that the police reasonably believe the search to be consensual." *Sanchez*, 156 F.3d at 878 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990)). Consequently, Mr. Cedano-Medina's actual subjective state of mind at the time that he allegedly gave his consent is not determinative; our focus, rather, is on how a reasonable person could have perceived his state of mind at that time. We must determine whether it was reasonable to believe that Mr. Cedano-Medina understood what Trooper Roby was asking and gave him permission to search the truck and, if so, whether it was reasonable to believe that that consent was voluntary.

## II.

The entirety of the encounter between Trooper Roby and Mr. Cedano-Medina leading up to the search was videotaped by a camera in Trooper Roby's cruiser, with audio provided by a microphone attached to Trooper Roby's body. This videotape was the central piece of evidence that the district court relied on in denying the motion to suppress, and we have examined it carefully. In evaluating Trooper Roby's conclusion that Mr. Cedano-Medina knowingly and voluntarily consented to the search of his vehicle, we rehearse the discernable dialogue and events on the videotape in some detail.

After Trooper Roby stopped Mr. Cedano-Medina's vehicle, Mr. Cedano-Medina provided his driver's license and vehicle registration upon request, the two

men talked for a while about Mr. Cedano-Medina's travel itinerary, and Trooper Roby wrote Mr. Cedano-Medina a warning citation for careless driving. Trooper Roby then asked Mr. Cedano-Medina if he could ask him a couple of questions, to which Mr. Cedano-Medina responded, "No, yeah," and then asked Trooper Roby questions about where to get dog food (Mr. Cedano-Medina was traveling with a dog that he told Trooper Roby was "free" and a gift for his brother, whom he was on his way to visit in "Rock-a-ford," Illinois.). Trooper Roby then said, "Out here, people have – uh, the stop's over and everything, you can go if you want, but – a lot of times people carry weapons. Do you have any pistols, any pistolas?" Mr. Cedano-Medina answered, "No." Trooper Roby also asked if there were any knives or marijuana in the vehicle, and Mr. Cedano-Medina responded "No" to both inquiries. Trooper Roby then inquired whether Mr. Cedano-Medina had ever been arrested or "in trouble with the cops," and Mr. Cedano-Medina answered "No" to both of these questions.

At this point, Trooper Roby said, "Okay, would you have a problem – can I search the vehicle? Can I look through it?" After each of these questions, Mr. Cedano-Medina said "yeah" (or possibly "huh" or "nah"). The conversation continued as follows:

Trooper Roby: "Can I look through your vehicle? Can I search it?"

Mr. Cedano-Medina: "Do I keep this?"

Trooper Roby: "Yeah. The vehicle? Can I search it?"

Mr. Cedano-Medina: "No." (Followed by two unclear syllables).

Trooper Roby: "Can I look through it?"

Mr. Cedano-Medina: "No. Oh, the food?"

Trooper Roby: "Through the, through the truck. Can I look through the truck?"

Mr. Cedano-Medina: "I don't know. I don't understand."

Trooper Roby: "Can I search the truck?"

Mr. Cedano-Medina: "The food?"

Trooper Roby: "Can I search the whole truck? On the inside and on the outside. Can I look through it?"

Mr. Cedano-Medina: (Unintelligible except for the words "outside," "nothing," and "inside.")

Trooper Roby: "Can I look?"

Mr. Cedano-Medina: "Yeah."

Trooper Roby: "I can?"

Mr. Cedano-Medina: "Yeah. No." (Followed by an unclear syllable.)

Trooper Roy: "No problem?"

Mr. Cedano-Medina: Something about "nothing" and "uh huh."

Trooper Roby: "Okay, there's nothing in there? No problem if I look?"

Mr. Cedano-Medina: "No." (Followed by something about "afraid".)

Trooper Roy: You don't care?

Mr. Cedano-Medina. "Nah."

Trooper Roy: "Is it okay? Can I go ahead?"

Mr. Cedano-Medina: (Unintelligible.)

-5-

Trooper Roby testified that, at some point toward the end of this exchange, Mr. Cedano-Medina said, "Sure, go ahead," although we did not hear these specific words on the tape.

After this, Trooper Roby said, "Okay, let's get your dog out here," and the two men exited the patrol car. Mr. Cedano-Medina walked ahead to his truck, opened the door, took his dog out of the truck on a leash, and stood back on the side of the road while Trooper Roby conducted the search. Mr. Cedano-Medina never made an effort to stop the search. At one point during the search, Mr. Cedano-Medina came up to the back of his truck and retrieved some water for his dog.

## III.

The difficulty in assessing Mr. Cedano-Medina's alleged consent arises from the obvious language barrier between him and Trooper Roby and the apparent lapses in communication that occurred during their conversation. Many of Mr. Cedano-Medina's utterances on the videotape are monosyllabic or undecipherable. Mr. Cedano-Medina argues that it was unreasonable for Trooper Roby to believe that he had consented to the search based on the ambiguous interaction that they had. Trooper Roby testified that, after he initially asked for Mr. Cedano-Medina's permission to search the truck, "his mannerisms and stuff made it clear to me that he wasn't exactly clear on what I was asking him." Trooper Roby further testified, though, that by the end of the conversation, he "felt that [Mr. Cedano-Medina] understood what I wanted to do, was look through the vehicle, search for drugs or anything illegal in there, and that he had given me permission to search for that."

The magistrate judge who initially evaluated the videotape noticed that Mr. Cedano-Medina's responses changed during the course of the questioning about the search from an initial hesitancy, with "a rising inflection indicating uncertainty," to a tone of voice indicating "certainty in his mind of what is being asked of him," "cordiality," and "eagerness to be cooperative." After watching the tape ourselves,

we think that this observation is clearly correct. Furthermore, Trooper Roby's testimony that Mr. Cedano-Medina told him at the end of the questioning that he could go ahead with the search, which the district court credited, is entitled to considerable weight. We think that these facts support the conclusion that Mr. Cedano-Medina believed that he understood Trooper Roby and that he decided to consent to something, though they perhaps provide only minimal insight into whether or not he correctly understood what was being asked of him.

Mr. Cedano-Medina's widely varying answers to Trooper Roby's questions (including his apparent misunderstanding that some of the attempts to obtain his consent were questions about dog food), and Trooper Roby's failure to use a Spanish language consent-to-search form (he testified that he carried such forms with him, but that he chose to not use one), might give us pause if we were considering this matter as an original proposition. We must, however, give appropriate deference to the district court's finding that it was reasonable for Trooper Roby to believe that Mr. Cedano-Medina consented to a search, and we are unable to conclude that it clearly erred in making this finding.

Mr. Cedano-Medina and Trooper Roby were evidently conversing without difficulty for a very substantial portion of their conversation (e.g., Mr. Cedano-Medina provided his license and registration upon request, and he successfully answered questions about the details of his trip). It was therefore not necessarily unreasonable for Trooper Roby to conclude that Mr. Cedano-Medina eventually came around to understanding his questions about searching the truck. Mr. Cedano-Medina's seemingly nonchalant attitude during the search (he readily got his dog out of the truck, stood quietly at the side of the road, and got water for his dog) lends further credence to Trooper Roby's conclusion that he consented. Given the apparent confusion during their conversation arising from Mr. Cedano-Medina's limited English proficiency, the use of a Spanish consent form here would certainly have

been desirable, but there is no bright-line rule requiring the use of such forms in situations like this. *See Carrate*, 122 F.3d at 670.

We note also that there was testimony from an investigator that, while being interviewed at the police station after the cocaine had been discovered, Mr. Cedano-Medina was asked if he had given permission to search the vehicle to Trooper Roby, and he replied, "yeah, go ahead, you bet." The government contends that this was an admission that he had consented to Trooper Roby's search. Mr. Cedano-Medina argues that he was actually giving permission to the investigator to "go ahead" with a second search rather than explaining what he had told Trooper Roby. We think that Mr. Cedano-Medina's statement to the investigator, though ambiguous, provides some support for the government's contention that Mr. Cedano-Medina consented to Trooper Roby's search. In any event, it is certainly not inconsistent with the theory that he consented to that search.

IV.

Having concluded that the district court did not clearly err by finding that it was reasonable to believe that Mr. Cedano-Medina consented to the search of his truck, we ask next whether it clearly erred by finding that a reasonable officer would have found that Mr. Cedano-Medina's consent was voluntary. Mr. Cedano-Medina argues that Trooper Roby made up his mind to conduct the search before receiving the alleged consent, and that the repeated questions about searching the truck were intended to browbeat him into acquiescing to the assertion of authority. Thus, he maintains, it was not reasonable for Trooper Roby to believe that the consent given was voluntary.

We do not think that it would have been reasonable to believe that Mr. Cedano-Medina understood that he was free to leave the scene instead of entertaining Trooper Roby's questions about searching the truck. Trooper Roby testified, in fact, that he did not know whether Mr. Cedano-Medina understood that he was free to go. The

government, however, was not required to demonstrate that Mr. Cedano-Medina knew of his right to refuse the request to search as a prerequisite to establishing a voluntary consent. *See Schneckloth*, 412 U.S. at 248-49. It only needed to prove that it was reasonable to believe that the consent was not the result of "duress or coercion, express or implied," *id.* at 248, and we conclude that the district court did not clearly err in finding that the government had made this showing.

Trooper Roby's requests for permission to search the truck were relentless, but "[t]here is certainly no legal rule that asking more than once for permission to search renders a suspect's consent involuntary, particularly where the suspect's initial response is ambiguous," *United States v. Jones*, 254 F.3d 692, 696 (8th Cir. 2001) (internal citation omitted). While Trooper Roby's repetitive attempts to obtain consent might reasonably be perceived as badgering, they could also be reasonably interpreted as legitimate attempts to achieve effective communication in the face of the language barrier. Relatedly, while Mr. Cedano-Medina's initial responses to Trooper Roby's attempts to obtain consent might be perceived as evidence of a hesitancy to allow the search, and his later responses as mere submission to Trooper Roby's pressure, we think that his earlier answers can reasonably be interpreted as reflective of his confusion about Trooper Roby's inquiries, and his later consent a result of his eventual understanding of what Trooper Roby was asking.

V.

For the reasons stated, we affirm the district court's denial of Mr. Cedano-Medina's motion to suppress the cocaine.

_____

-9-