# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3504

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Miguel Angel Correa, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: May 12, 2011
Filed: June 13, 2011

_____

Before MURPHY and COLLOTON, Circuit Judges, and ERICKSON,[1] District Judge.

_____

MURPHY, Circuit Judge.

Nebraska state troopers found methamphetamine in Miguel Correa's possession as he was traveling by bus through Omaha. Correa was arrested and indicted for possession with intent to distribute over five hundred grams of methamphetamine. The district court granted Correa's motion to suppress evidence of the methamphetamine and the statements he made after its discovery. The government

_____

[1]The Honorable Ralph R. Erickson, Chief Judge, United States District Court for the District of North Dakota, sitting by designation.

challenges that order in this interlocutory appeal. We reverse and remand for further proceedings.

The following undisputed facts are from suppression hearing testimony. In April 2010 Correa was traveling by bus from Las Vegas to Des Moines. His bus stopped in Omaha, where all through passengers briefly got off at the terminal. Nebraska state troopers were checking bus passenger lists for people who had bought their tickets in cash within a day of departure from drug source cities, such as Las Vegas. They found three such people on Correa's bus; he was one of them.

After the through passengers reboarded, troopers Scott, Eberle, and Rasgorshek got on the bus. They wore plain clothes but carried concealed weapons. They followed their usual practice in checking out the passengers. Rasgorshek knelt in the driver's seat facing backwards into the bus. Eberle and Scott went to the back of the bus and began to work their way forward, asking to see each passenger's ticket.

Scott eventually reached Correa, who sat in the front third of the bus. Scott stood slightly behind Correa's seat, not blocking him from the aisle. When Correa showed his ticket, Scott realized that he was one of the passengers in which they were interested. Scott asked where Correa was going, where he had come from, and which items on the bus were his. Correa said he was going home to Des Moines but that he had been in Las Vegas for ten years. He clarified that he lived in Las Vegas but would visit family in Des Moines for up to a few weeks. Throughout their encounter Scott and Correa spoke in English in normal conversational tones. Scott found Correa's demeanor "evasive but not confused."

Scott noticed that during their conversation Correa "periodically reach[ed] over and reposition[ed]" a jacket on the empty seat next to him. He observed that Correa became increasingly nervous over the course of the conversation. Asked about his luggage, Correa pointed overhead to a small gym bag which Scott considered too

small for the trip he described. Scott told Correa that the troopers were "watching for people transporting illegal . . . guns, knives, [and] drugs," and asked permission to search him, his bag, and his jacket. Correa said yes, pointed to his bag, and stood, apparently expecting to be patted down. Scott told Correa "he could say seated," and again asked Correa's permission specifically to search the jacket. Correa said "yes" and handed it to Scott. Scott noted that the jacket felt heavy and found inside it two duct taped wet wipe container packages. Each weighed about a pound. Scott testified that in his six years of conducting searches on buses, he had "never come across a duct taped wet wipe container that did not contain methamphetamine."

Scott handcuffed Correa, removed him from the bus, and took him to a back office of the bus terminal. Scott did not consider this removal an arrest, but rather "custody . . . in furtherance of [his] investigation." Over 500 grams of methamphetamine were found inside the containers, "confirm[ing] [Scott's] suspicion." Scott then issued a Miranda warning. Correa waived his Miranda rights and made incriminating statements, offering to reveal his contacts in Des Moines in exchange for leniency.

Correa was indicted for possession of methamphetamine with intent to distribute under 21 U.S.C. § 841. He moved to suppress his statements and the drugs, citing the Fourth Amendment. Correa argued that Scott's initial questioning on the bus was a detention unsupported by reasonable suspicion, that his consent to search was involuntary, and that his subsequent removal from the bus was an arrest unsupported by probable cause.

After a hearing, the magistrate judge issued a report and recommendation to deny Correa's motion to suppress the evidence. He concluded that the encounter between Scott and Correa on the bus was not a detention, that Correa had voluntarily consented to the search which yielded the duct taped containers, that Correa's consent to search extended to the search in the bus depot opening the containers, and in the

alternative that opening the containers was justified as an investigative detention and search under Terry v. Ohio, 392 U.S. 1 (1968).

The district court adopted only the magistrate judge's factual findings before granting Correa's motion to suppress. The district court concluded that Scott's conversation with Correa on the bus was an illegal detention and found that Correa had not voluntarily consented to a search on the bus. The government now brings an interlocutory appeal of the district court's rulings.

We review de novo the question of whether Correa was detained on the bus. United States v. Valle Cruz, 452 F.3d 698, 705 (8th Cir. 2006). A detention occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). In situations in which a person would have "no desire to leave," the question is instead whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 435–36 (1991).

Relying on United States v. Drayton, 536 U.S. 194, 204 (2002), the government argues that Scott's conversation with Correa on the bus was not a detention triggering Fourth Amendment protection. In Drayton, police boarded Drayton's bus during a scheduled stop. Id. at 197. One officer knelt in the driver's seat, and the other two went to the back of the bus. One remained there while the other worked his way forward questioning passengers. The questioning officer stood slightly behind each passenger so that they could easily get out of their seats. Id. at 197–98. After arresting Drayton's seatmate who was carrying drugs, the officer asked Drayton, "May I search you?" Drayton allowed a pat down, revealing drugs taped to his body. Id. at 199.

-4-

The Supreme Court held that this procedure did not violate the Fourth Amendment. Drayton had not been detained since "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." Id. at 204. The officer kneeling in the driver's seat did not "tip the scale" because he "did nothing to intimidate passengers . . . [and] said nothing to suggest people could not exit and indeed he left the aisle clear." Id. at 205.

Correa urges us to consider Drayton in light of Brendlin v. California, 551 U.S. 249, 257–28 (2007), which made clear that vehicle passengers, not only drivers, can be seized during traffic stops. Although Brendlin is relevant to the seizure in this case, it does not diminish Drayton's precedential value and it in fact even cited Drayton. Id. at 255, 257.

While the facts of this case are very similar to those in Drayton, the district court focused on what it found different. It noted the possibility that other passengers or Officer Eberle may have been occupying the aisle. Scott's "pointed" questions indicated to the district court that "[a] reasonable person would assume . . . [he] is not free to leave." The court also was concerned that Correa could have understood Scott's statement that Correa "[could] remain seated" as a "command." "Most important[]" to the district court, Scott had already singled out Correa for investigation. The court acknowledged, however, that "subjective intent of the officers" is not relevant unless it "has been conveyed to the person confronted," which was not the case here.

The officers in this case followed almost exactly the same procedure used in Drayton. In both "[t]here was no application of force, no intimidating movement, no overwhelming show of force, [and] no brandishing of weapons." 536 U.S. at 204. Scott did not threaten Correa, and there is no evidence that the aisle between Correa and the exit was blocked during their conversation. Scott's tone was "conversational"

rather than authoritative. Informing Correa that he did not have to stand was not enough to convince a reasonable person that he was required to sit.

We have held there was no Fourth Amendment violation in certain other bus interventions. For example, there was no detention by uniformed officers who boarded a bus during a scheduled stop and announced "if you are not [a United States citizen] please have your immigration documents ready for inspection." United States v. Angulo-Guerrero, 328 F.3d 449, 450 (8th Cir. 2003) (internal punctuation omitted). Nor was there when an officer asked a bus passenger for identification after he had already declined another officer's request to search his luggage. United States v. Richards, 611 F.3d 966, 968 (8th Cir. 2010). We noted that the second officer's tone was "friendly" and she did not create a "threatening presence." Id. at 969. Even though the officer in fact "would have . . . detain[ed] him had he not complied," the court concluded that "a reasonable person would have felt at liberty to decline [the officer's] request." Id. at 970. Similarly, a reasonable person in Correa's position would have felt free to end the conversation with Officer Scott. The district court therefore erred in holding that their conversation on the bus was a detention subject to Fourth Amendment protection.

The district court also found that Correa did not voluntarily consent to Scott's search of his jacket, which we review for clear error. United States v. Va Lerie, 424 F.3d 694, 700 (8th Cir. 2005) (en banc). To satisfy the Fourth Amendment's protection from unreasonable searches, "the subject of a search [must have given] consent that was the product of an essentially free and unconstrained choice." United States v. Cedano-Medina, 366 F.3d 682, 684 (8th Cir. 2004) (internal punctuation omitted).

The district court doubted that Correa understood English well since he "point[ed] and gestur[ed]" to Scott and appeared in court with a Spanish interpreter. Correa compares this case to United States v. Guerrero, 374 F.3d 584 (8th Cir. 2004).

-6-

There, Guerrero "spoke in Spanish, in extremely broken English, or would repeat what [the officer] had asked him" Id. at 586. He also gave answers showing his confusion, such as replying "Chicago" when asked how fast he had been driving. At times the officer "had to use hand gestures before Guerrero . . . was able to respond." Id. We discerned no clear error in the district court's finding that Guerrero had not "knowingly and voluntarily" consented to a search, id. at 589, but we find this case quite different.

In determining whether consent to search was voluntarily given, we consider the totality of the circumstances and particularly the defendant's

> age, education, intelligence, sobriety, and experience with the law; and . . . context . . . , such as the length of . . . questioning, the substance of any discussion . . . preceding the consent, whether the defendant was free to leave . . . , and whether the defendant's contemporaneous reaction to the search was consistent with consent.

Va Lerie, 424 F.3d at 709. We ask "not whether [a defendant] subjectively consented, but rather, whether a reasonable officer would believe consent was given." United States v. Pena-Ponce, 588 F.3d 579, 584 (8th Cir. 2009).

The district court also found "nothing . . . to support the conclusion that the defendant was of average intelligence and could reasonably comprehend the situation." The government argues that the district court clearly erred in finding Correa's consent involuntary since Officer Scott testified that he "seemed to be of average intelligence" compared with other people he had questioned and Correa contributed to the conversation without apparent difficulty. Unlike Guerrero, Correa did not appear to struggle with English. Though Correa pointed and gestured, he also spoke. His answers were appropriate, indicating that he had understood Scott's questions. Scott asked Correa specifically about searching his jacket, and Correa replied "Yes" and handed over the jacket to Scott.

Keeping in mind the factors we discussed in Va Lerie, we conclude that a reasonable officer in Scott's position would have believed that Correa had consented to a search of himself, his jacket, and its contents. Correa was twenty nine years old, and the record contains no evidence that he was of less than average intelligence and education. He was sober during the conversation which was brief. A reasonable person in Correa's position would not have felt subject to restraint or coercion. His contemporaneous reaction to the search—compliance and silence—was consistent with consent. We conclude that the district court erred in finding that Correa did not voluntarily consent to search.

After discovering the containers, Scott "placed [Correa] in custody, detain[ing] him in the furtherance of [his] investigation." He handcuffed Correa and removed him from the bus without saying whether Correa was arrested, and Correa did not resist. Officers Eberle and Rasgorshek apparently remained on the bus. Once inside the bus terminal, Scott opened the containers which Correa had voluntarily turned over for search and discovered methamphetamine. Scott then issued Miranda warnings and informed Correa he was under arrest.

Although officers conducting Terry stops must use "the least intrusive means . . . that are reasonably necessary," they may take measures "reasonably necessary to protect their personal safety." United States v. Newell, 596 F.3d 876, 879 (8th Cir. 2010). In Newell, we held that a Terry stop's scope was not exceeded when two officers had handcuffed a suspect after noticing a bag of cocaine protruding from his pocket. Id. at 880. Likewise, in United States v. Navarrete-Barron, 192 F.3d 786, 791 (8th Cir. 1999), officers did not exceed the scope of a Terry stop by handcuffing suspects while they searched their truck, which the officers believed was involved in drug trafficking. The handcuffing was a "reasonable precaution" in light of the dangerous nature of the suspected crime. Id. Drug trafficking is often accompanied by dangerous weapons. Newell, 596 F.3d at 880; Navarrete-Barron, 192 F.3d at 791. Having good reason to suspect Correa was trafficking drugs, Scott reasonably

-8-

protected the evidence and the safety of those on the bus by handcuffing Correa and removing him.

We conclude that the Fourth Amendment was not violated by Scott's investigative detention of Correa, including handcuffing him and removing him from the bus, or by opening the suspicious containers which revealed a large amount of what proved to be methamphetamine.[2]  There was then probable cause to arrest Correa.

For these reasons, the order of the district court is reversed and vacated.  The case is remanded for further proceedings consistent with this opinion.

_____

[2]Correa's motion to supplement the record is denied as moot.