# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3071

_____

United States of America

*Plaintiff - Appellee*

v.

Adan Garcia-Garcia

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: November 15, 2019
Filed: April 29, 2020

_____

Before GRUENDER, KELLY, and ERICKSON, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Adan Garcia-Garcia entered a conditional guilty plea to one count of possession with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and

(b)(1).  Garcia now appeals his conviction, arguing that the district court[1] erred in denying his motion to suppress evidence.  We affirm.

## I.

On the morning of May 12, 2017, Kevin Finn, an investigator with the Nebraska State Patrol commercial narcotics interdiction unit, conducted routine surveillance inside a Greyhound bus station in Omaha, Nebraska.  There, Finn noticed a suitcase sitting next to a bus, waiting to be loaded into the checked-baggage compartment.  Three things about the suitcase caught Finn's attention: it was new; it emitted an odor consistent with a "masking agent," such as an air freshener, which he later testified drug traffickers use to hide the scent of narcotics from detection; and it was tagged for a trip from Denver, a location known to law enforcement as a hub for narcotics trafficking, to Indianapolis.  Based on these facts, Finn suspected that the suitcase may contain illegal narcotics.  He examined its luggage tag and noted that it was ticketed to an "Adam Garcia."

Finn approached Garcia, who he identified as the lone male standing without luggage in the terminal waiting to board the bus.  The entirety of the encounter between Finn and Garcia was videotaped, with audio provided by a microphone.  We have carefully examined this recording, as well as other exhibits, transcripts, and testimony.  The facts set out below are those found by the magistrate judge and district court and are not clearly contradicted by the record.

After approaching Garcia, Finn—speaking in English—identified himself, displayed his badge, and told Garcia he was not under arrest.  Finn then asked Garcia, "*¿habla inglés?*"  Garcia indicated that he did not speak English but that he did speak Spanish.  Finn, while not a fluent Spanish speaker, began to ask simple questions of

---

[1]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska, adopting the findings and recommendation of the Honorable Michael D. Nelson, United States Magistrate Judge for the District of Nebraska.

Garcia in Spanish, including where he was coming from and where he was going. Garcia indicated he was traveling from Denver to Indianapolis.

Speaking in English again, Finn asked for Garcia's identification and bus ticket, which Garcia produced without expressing any difficulty in understanding him. The name on the documents was consistent with that on the suitcase Finn had observed by the bus. Viewing Garcia's boarding pass and checked-baggage ticket, Finn then asked, in Spanish, "*¿uno bolsa?*", by which Finn intended to ask, "one bag?" Garcia confirmed that he had one bag. Finn then returned the documents to Garcia.

To ensure Garcia understood him, Finn began to translate his questions using a smartphone translation application. He asked Garcia if he had any drugs in his bag. Garcia replied "no." The parties agree that Finn then asked Garcia for consent to search Garcia's "*bolsa*," or bag, and that Garcia consented to the search. At no point did Garcia express difficulty understanding the smartphone translation application.

After consenting to a search of his "*bolsa*," Garcia led Finn outside to the bus. Once they reached the boarding area, Garcia motioned toward the passenger area of the bus, but Finn stopped him, pointed to the previously identified suitcase sitting on the ground in the checked-baggage area, and asked Garcia if it belonged to him. Finn read the luggage tag aloud, and Garcia confirmed the bag was his. Finn then asked, "*¿permite?*", or "May I?" In response, Garcia put his hands up and nodded. According to Finn, based on Garcia's prior consent to search his bag, he interpreted Garcia's response as one indicating he was not "withdrawing his previously given consent." Less than thirty seconds elapsed between Finn's first request to search Garcia's bag made inside the station and his subsequent search of Garcia's suitcase beside the bus.

Finn unzipped and searched the suitcase as Garcia watched. Garcia, standing within inches of Finn, made no attempt to stop him nor did he express any opposition

to the search. In a zipper lining of the bag, Finn found several wrapped bundles, which were later confirmed to contain heroin. Finn arrested Garcia, and Garcia was subsequently charged with possession with intent to distribute one kilogram or more of a mixture or substance containing a detectable amount of heroin. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i).

Before the district court, Garcia moved to suppress all evidence stemming from the search of his suitcase on the grounds that the evidence comprised fruit of an unconstitutional search. *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). The district court denied the motion to suppress, finding that it was reasonable under the circumstances for Finn to believe that Garcia knowingly and voluntarily consented to the search of his suitcase. Garcia then entered a conditional guilty plea, and the district court sentenced him to 46 months' imprisonment.[2] Garcia appeals.

## II.

Garcia argues that the district court erred by not granting his motion to suppress evidence because he did not consent to a search of his suitcase. In the alternative, he argues that even if he consented, it was unreasonable to conclude that his consent was given voluntarily.

"We review the denial of a motion to suppress de novo but the underlying factual determinations for clear error, giving due weight to inferences drawn by law enforcement officials." *United States v. Tamayo-Baez*, 820 F.3d 308, 312 (8th Cir. 2016). This court will affirm the district court's denial of "a motion to suppress unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and

---

[2]Garcia's sentence is below the mandatory minimum term of 120 months' imprisonment because the district court determined that he qualified for relief under the statutory safety valve. *See* 18 U.S.C. § 3553(f).

definite conviction that a mistake has been made." *United States v. Garcia*, 888 F.3d 1004, 1008 (8th Cir. 2018).

The Fourth Amendment protects "[t]he right of the people to be secure in their . . . effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A consensual search is consistent with the Fourth Amendment because it is "reasonable for the police to conduct a search once they have been permitted to do so." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Thus, a "warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to a search." *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004). "The issue turns not on the defendant's subjective state of mind, but on whether the officer reasonably believed the defendant consented." *United States v. Espinoza*, 885 F.3d 516, 523 (8th Cir. 2018).

A.

Garcia first contends that it was unreasonable for Finn to search his suitcase because Finn never effectively communicated a request to search the suitcase. According to Garcia, Finn's question, "*¿permite?*", did not convey a request to search, and Finn could not rely on Garcia's previous consent to a search of his "*bolsa*" because a reasonable Spanish speaker would understand the term to refer to a backpack, not a suitcase. Thus, he only consented to a search of his backpack, which he was attempting to retrieve from the bus when Finn began searching his suitcase.

Consent-to-search cases involving translated requests present a threshold question of comprehension. *United States v. Gallardo*, 495 F.3d 982, 988 (8th Cir. 2007). We have previously suggested that a reasonable officer would not believe that a suspect consented where there is a clear lack of comprehension by the listener. *See Cedano-Medina*, 366 F.3d at 686-87. This is because a reasonable officer would only believe a suspect consented if he believed the suspect understood the request. *See Jimeno*, 500 U.S. at 251 (noting that we measure reasonableness in this context

by determining what "the typical reasonable person [would] have understood by the exchange"). Therefore, we must determine if "it was reasonable to believe that [Garcia] understood what [Finn] was asking and gave him permission to search the [suitcase]." *Cedano-Medina*, 366 F.3d at 685.

In the context of an imperfect translation, we look to indicators that would give a reasonable officer confidence that the suspect comprehended the request. *See, e.g.*, *Gallardo*, 495 F.3d at 988; *United States v. Leiva*, 821 F.3d 808, 818-19 (7th Cir. 2016). These include whether the "context of the conversation" made the officer's meaning reasonably apparent, *Gallardo*, 495 F.3d at 988; whether the suspect responded in appropriate ways suggesting comprehension, *see United States v. Guerrero*, 374 F.3d 584, 588 (8th Cir. 2004); and whether the officer relied on a translation produced by a reliable source such as a translator, *United States v. Sanchez*, 32 F.3d 1330, 1333-35 (8th Cir. 1994), or an approved foreign-language consent form, *Cedano-Medina*, 366 F.3d at 687. As elsewhere in the Fourth Amendment context, no factor is dispositive; we instead analyze reasonableness based on the totality of the circumstances. *United States v. Drayton*, 536 U.S. 194, 206-07 (2002). We review for clear error the factual determination that a reasonable officer would believe the suspect comprehended and consented to the request. *See Garcia*, 888 F.3d at 1009; *United States v. Mendoza*, 677 F.3d 822, 829 (8th Cir. 2012).

With these principles in mind, we conclude the district court did not clearly err in finding that a reasonable officer would have believed Garcia understood that Finn was requesting to search his suitcase. Viewed out of context and looking only at a transcript, Garcia's argument may have some purchase. But when Finn's and Garcia's words and actions are analyzed in context, Garcia's argument fails. *See Gallardo*, 495 F.3d at 988 (looking to the context of a conversation to determine whether a reasonable officer would believe the suspect comprehended a request to search and consented to it).

At the suppression hearing, Garcia's Spanish-language expert, Dr. Jeck-Jenard Navarrete, testified that *bolsa* could refer to an assortment of bags. Although *bolsa* would not usually be used to refer to luggage, Dr. Navarrete acknowledged that the word *bolsa* could be a general term, and that depending on the circumstances and surrounding words, *bolsa* may refer to anything from a pocket to a travel bag. Context is key. For example, a Spanish speaker would understand *bolsa* to refer to a suitcase if a person used the word in reference to a suitcase, such as while pointing at one.

Here, Finn asked Garcia if he had one bag—"*uno bolsa*"—while pointing to Garcia's checked-baggage ticket.[3] The only bag Garcia checked was his suitcase. Finn then used the same word when requesting permission to search Garcia's bag while the men conversed inside the station. It was therefore reasonable for Finn to believe the two men were discussing the same bag—the only bag Garcia checked. *See Leiva*, 821 F.3d at 818-19; *see also United States v. Rojas-Millan*, 234 F.3d 464, 470 (9th Cir. 2000) (holding that it was reasonable for officers to believe suspect consented to a search when a Spanish-language expert testified that though the

_____

[3]We note the dissent's suggestion that Garcia may not have understood his checked-baggage ticket was a receipt for his checked luggage, and that as a result, using it as a reference point was unreasonable, *infra*, at 18-19, but we do not believe the record supports such a conclusion. Instead, when Finn pointed at the receipt and asked in both English and Spanish, "one bag?", Garcia responded affirmatively and correctly, "*sí*," "*un*." And Garcia only received the ticket because he checked a bag. It was thus reasonable for Finn to conclude that when he pointed to it, Garcia would understand that the ticket corresponded to his checked luggage.

Neither are we convinced by the dissent's contention that because Garcia did not understand what Finn was asking in one instance when he pointed at an object, he must not have understood Finn in this instance. Although Garcia may not have understood the English words "boarding pass" even as Finn pointed outside to the bus, he did respond appropriately to "your ticket" when Finn pointed at it. More importantly, we fail to see the relevance of an earlier question asked of Garcia *in English* to our analysis of whether he understood a later question asked *in Spanish*— and we certainly are not left with a definite and firm conviction that the district court clearly erred.

relevant Spanish term could be translated in different ways, its meaning was reasonably apparent in the relevant context).

Garcia argues that Finn knew at the time he searched the suitcase that Garcia had a backpack on the bus and that Garcia had only consented to a search of his backpack. Garcia relies on a brief statement Finn made to an unidentified officer *after* the search, when Finn stated that Garcia mentioned "another [bag]" when they "first started talking." Garcia did not question Finn about this comment during the suppression hearing, and as a result, it is unclear what Finn meant. Regardless, immediately following that remark, Finn explained that, in fact, he did not believe Garcia *actually* had a bag on the bus. Having reviewed the video and a transcript of the audio, we are confident that prior to the search of the suitcase, Finn never saw that Garcia had a second bag nor did Garcia ever mention a second bag. As a result, while this discrepancy might give us pause were we considering this as an original matter, the magistrate judge, whose findings were adopted by the district court, found that Finn was credible, and based on the record, we are unable to conclude that the district court clearly erred. *See United States v. Coleman*, 909 F.3d 925, 929 (8th Cir. 2018).

We find a case from a sister circuit particularly illustrative. In *Leiva*, the Seventh Circuit held that it was not clearly erroneous to find that a defendant voluntarily consented to a search even though the officer's request to search was not properly phrased in Spanish. 821 F.3d at 818-19. There, the officer asked a suspect "*¿Puedo buscar su coche?*", which the officer believed meant, "May I search your car?" *Id.* at 813. According to the defendant's Spanish-language experts, the phrase meant "May I *look for* your car?", "May I *get* your car?", or "May I *locate* your car?" *Id.* at 814. The defendant argued he had not consented to a search of his car but instead had permitted the officer to "look for" his car. The court was unpersuaded, finding that the context made the officer's meaning apparent and that the defendant responded in a way that indicated he understood the request. *Id.* at 818-19. The officer and the defendant were standing near the defendant's car, which had not

moved since the officer initiated the traffic stop, and as a result it would have been clear to a reasonable person that the officer did not need to look for the car. *Id.*

As in *Leiva*, so too here. Although Finn's Spanish translation may have been imperfect, the context of the interaction and Garcia's response mean it was not clearly erroneous to find that a reasonable officer would believe Garcia understood Finn's request.

The relative ease with which Garcia and Finn communicated using the translation application further supports the district court's finding that it was reasonable for Finn to believe Garcia consented based in part on a request using the term *bolsa*—a translation produced by the application. *See Cedano-Medina*, 366 F.3d at 687 (emphasizing that the officer and suspect "convers[ed] without difficulty for a very substantial portion of their conversation"). Dr. Navarrete testified that the application was suitable for translating general terms and simple sentences. Here, Finn limited his questioning to simple sentences, and Garcia expressed no difficulty in understanding the application. Indeed, Garcia and Finn were able to communicate with a reasonable level of ease and accuracy while using the application. Finn asked Garcia five questions using the application and Garcia responded appropriately to each one, offering details regarding the nature and length of his travel. When asked if he had drugs in his bag, Garcia answered no. And when Finn asked if he could search the bag, Garcia answered in the affirmative, "*sí.*" He then walked with Finn outside toward his bag. Thus, Garcia responded in ways that indicated comprehension, a factor supporting the district court's determination that a reasonable officer would believe Garcia understood him. *See Leiva*, 821 F.3d at 818-19.

Finally, we conclude the district court did not clearly err in finding that "[t]he video indicates that Finn clarified any confusion that may have existed" as to the meaning of his request. Once outside, Finn pointed to Garcia's suitcase, inquired as to whether it was his, and read the name tag aloud. Once Garcia confirmed the bag belonged to him, Finn asked, "*¿permite?*" In context, a reasonable officer would

-9-

expect a person to understand the question "*¿permite?*", or "May I?", as requesting consent to search the suitcase. *See Gallardo*, 495 F.3d at 988 (examining the totality of the circumstances and determining that, based on the context, the suspect would have interpreted the officer's ambiguous statement as a request to search his truck). Simply put, we are unconvinced by Garcia's argument that—despite the circumstances immediately preceding Finn's second request and despite the reason they had walked to the bus in the first place—Garcia had no idea that Finn was reiterating his request to search the suitcase, or more precisely, that it was unreasonable for Finn to conclude that Garcia understood Finn's request.[4] *See United States v. Rodriguez*, 834 F.3d 937, 940 (8th Cir. 2016) ("[T]he ultimate inquiry is not whether the defendant subjectively consented, but whether a reasonable officer would believe consent was given." (internal quotation marks omitted)).

Our cases encouraging the use of Spanish-language consent forms in similar circumstances are not to the contrary. *See Cedano-Medina*, 366 F.3d at 687. Although the use of such forms may be "desirable," "there is no bright-line rule

---

[4]The dissent agrees with Garcia, suggesting that "[o]n its own," "May I?" is "ambiguous and invites the listener to wonder, 'May you *what*?'" *Infra*, at 20. The dissent contends that Garcia's "lack of comprehension leading up to this unclear question" made it unreasonable to expect "Garcia to fill in the gaps from context." *Id.* But respectfully, although Garcia contends *bolsa* does not mean suitcase, he does not dispute—in fact, he concedes—that he understood Finn requested to search a bag. Accordingly, in context, the meaning of Finn's question, "*¿permite?*", was clear. Indeed, Garcia did not object or even express surprise when Finn unzipped and searched his suitcase, a reaction that strongly suggests he expected Finn's actions because he understood Finn's request. *See United States v. Berger*, 823 F.3d 1174, 1178-79 (8th Cir. 2016) (noting that suspect's failure to object or protest to scope of search is "strong evidence of [his] understanding of the scope of his consent"); *United States v. Meza-Gonzalez*, 394 F.3d 587, 592 (8th Cir. 2005) (holding that it was objectively reasonable to conclude individual consented to search where the individual could observe the search and never objected to it); *United States v. Luken*, 515 F. Supp. 2d 1020, 1036 (D.S.D. 2007) (recognizing that suspect's lack of "dismay or surprise" at extent of search supports finding of consent).

requiring the use of such forms," and where, as in the present case, a suspect has not expressed or demonstrated difficulty understanding the officer, failure to use a Spanish-language consent form does not negate a suspect's consent. *See id*; *see also United States v. Figueroa-Espana*, 511 F.3d 696, 705 (7th Cir. 2007) (holding that it was not clear error to find suspect consented even though the officer's "Spanish was accented and flawed" when evidence suggested the suspect "understood the questions and responded accordingly").

Thus, the district court did not clearly err in finding that a reasonable officer would believe Garcia understood Finn's request to search the suitcase.

B.

Garcia next contends that even if Finn's questions could be construed as a request to search the suitcase, Garcia never gave his consent. He instead only consented to a search of his backpack and, when it was clear the men were not effectively communicating, "threw his hands up in the air and did nothing."

To show that a person consented to a search, the Government must demonstrate by a preponderance of the evidence that consent was "the product of an essentially free and unconstrained choice." *Cedano-Medina*, 366 F.3d at 684. Accordingly, the Fourth Amendment is not satisfied by "mere submission to a claim of lawful authority." *Id.* Consent, however, may be inferred from the subject's "words, gestures, and other conduct." *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001). "The boundaries of a consensual search are confined to the scope of the consent . . . ." *United States v. Shafer*, 608 F.3d 1056, 1064 (8th Cir. 2010). As with consent generally, "[t]o determine the scope, we consider what 'the typical reasonable person [would] have understood by the exchange between the officer and the suspect.'" *Id.* at 1064 (quoting *United States v. Siwek*, 453 F.3d 1079, 1085 (8th Cir. 2006)). A suspect may expand the scope of his consent during the search through his words or conduct. *See Garcia*, 888 F.3d at 1010. We review for clear error the factual determinations that a reasonable officer would believe that a suspect

consented and that the officer did not exceed the scope of the defendant's consent. *Mendoza*, 677 F.3d at 829; *Siwek*, 453 F.3d at 1083, 1085.

Garcia's response to Finn's question, "*¿permite?*"—raising his hands and nodding—lends credence to Finn's conclusion that Garcia was either reaffirming or expanding the scope of his consent. *See United States v. Mendoza-Cepeda*, 250 F.3d 626, 627, 629 (8th Cir. 2001) (finding that a suspect consented to a search of his midsection when he raised his arms in response to an officer's request); *see also United States v. Faler*, 832 F.3d 849, 853 (8th Cir. 2016) (collecting cases finding implied consent based on gestures). Although Garcia argues he did not nod, he admits that his head movement was "ambiguous." After a review of the video evidence, we conclude that the district court's factual finding is not clearly erroneous and that Garcia's gestures were "consistent with consent." *See Mendoza*, 677 F.3d at 829.

Garcia was also compliant throughout the encounter and never objected to the search as it began or unfolded, either physically or verbally. *See Espinoza*, 885 F.3d at 524 (finding that a defendant consented to search where he raised his arms for a patdown and never changed his "cooperative response and demeanor"); *Cedano-Medina*, 366 F.3d at 687 (noting that the suspect's "nonchalant attitude" during the search supported a finding that he consented to the search). And because Finn reasonably believed Garcia consented to a search of his suitcase when he agreed to a search of his "*bolsa*," it was not unreasonable for Finn to conclude Garcia's later gestures and conduct were consistent with that consent. *See Mendoza*, 677 F.3d at 829 (affirming that officers could rely on suspect's "gestures and body language" for consent).

Therefore, examining the totality of the circumstances, we are not left with "a firm and definite conviction" that it was clearly erroneous to find that a reasonable officer would believe Garcia consented to a search of his suitcase. *See Garcia*, 888 F.3d at 1008.

-12-

C.

Garcia next argues that the evidence should have been suppressed because his consent was not given voluntarily. We disagree. The district court did not clearly err in finding that a reasonable officer would believe Garcia gave his consent voluntarily—that is, his consent was not the result of "duress or coercion, express or implied." *See Cedano-Medina*, 366 F.3d at 688.

We analyze several factors in determining whether consent was given voluntarily, taking into account the totality of the circumstances. *United States v. Correa*, 641 F.3d 961, 966-67 (8th Cir. 2011); *United States v. Willie*, 462 F.3d 892, 896 (8th Cir. 2006). Those factors include the defendant's

> age, education, intelligence, sobriety, and experience with the law; and . . . context . . . , such as the length of . . . questioning, the substance of any discussion . . . preceding the consent, whether the defendant was free to leave . . . , and whether the defendant's contemporaneous reaction to the search was consistent with consent.

*Correa*, 641 F.3d at 966-67 (quoting *United States v. Va Lerie*, 424 F.3d 694, 709 (8th Cir. 2005) (en banc)). We have previously grouped these factors into three categories: (1) the nature of the interaction between police and the defendant, (2) the personal characteristics and behavior of the defendant, and (3) the environment surrounding the defendant at the time he gave his consent. *Gallardo*, 495 F.3d at 989.

We think that, on balance, the nature of Garcia and Finn's interaction leading up to and during the search was consistent with voluntary consent. *See Mendoza*, 677 F.3d at 829. We note that Detective Finn never used Spanish to tell Garcia that he was not under arrest or that he was free to leave. Finn also never informed Garcia that he could refuse the request to search his bag. These factors weigh against a finding of voluntariness. *Gallardo*, 495 F.3d at 989; *Willie*, 462 F.3d at 896-97.

Nevertheless, the Government "was not required to demonstrate that [Garcia] knew of his right to refuse the request to search as a prerequisite to establishing . . . voluntary consent." *Cedano-Medina*, 366 F.3d at 687-88. It needed only to prove that a reasonable officer would believe that the consent was not the result of "duress or coercion, express or implied." *Id.* at 688. Here, Garcia advances no evidence that Finn used "force, coercion, intimidation or deception" during the encounter. *Mendoza*, 677 F.3d at 829; *see also United States v. Hampton*, 260 F.3d 832, 835 (8th Cir. 2001) (deciding the lack of any use of force, coercion, or deception by the police contributed to the reasonableness of finding that the defendant voluntarily consented). Finn never brandished a weapon, forcibly moved Garcia, or threatened Garcia in any way; the interaction lasted only minutes; and Finn kept a cordial demeanor at all times. *See Willie*, 462 F.3d at 896 (explaining that the nature, length, and location of the interaction between the police and defendant are factors relevant to determining whether a suspect's will was overborne).

We also find nothing in Garcia's personal characteristics that suggests he was especially susceptible to having his will "overborne" or that "'his capacity for self-determination [was] critically impaired' at the time he gave consent to the search." *See Gallardo*, 495 F.3d at 989 (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)). Garcia was twenty-six years old, and the district court found that Garcia appeared sober, of sound mind, and of at least average intelligence. These characteristics do not suggest Garcia was not "competent to understand the nature of his acts," *see Willie*, 462 F.3d at 896, nor do they indicate that he was particularly vulnerable to police coercion, *see Gallardo*, 495 F.3d at 989.

Neither was the environment of the encounter inherently coercive. *See Willie*, 462 F.3d at 897. Instead, Finn approached Garcia in a crowded public bus station in the early morning daylight. This was not an encounter in which the environment was "secluded or threatening" such that Garcia would reasonably feel under duress or coercion. *See Gallardo*, 495 F.3d at 989 (holding that a discussion in a squad car was not inherently coercive because the car was "parked on the shoulder of a well-traveled Interstate highway during the middle of a summer day").

-14-

Finally, as discussed, Garcia never objected—either verbally or physically—to Finn's search of his suitcase. Instead, he raised his arms and nodded. We have previously found similar contemporaneous reactions to a search—for example, "compliance and silence"—to be consistent with voluntary consent. *See Correa*, 641 F.3d at 967. Accordingly, we cannot say that the district court clearly erred in finding that a reasonable officer would have determined Garcia's consent was given voluntarily. *See Espinoza*, 885 F.3d at 523 ("[T]he government only needed to prove that it was reasonable for [the officer] to believe that [the suspect's] consent was not the result of duress or coercion, express or implied." (internal quotation marks omitted)); *United States v. Smith*, 260 F.3d 922, 925 (8th Cir. 2001) (finding defendant voluntarily consented to a search of his luggage at a bus station where "the encounter occurred in a public place during daylight hours, . . . the entire episode leading up to the search lasted only a few minutes, . . . [the defendant] expressed no reluctance to speak with the officers or to permit the search of his bag, and . . . [the defendant] indicated his consent to the search by raising his hands").

Because it did not clearly err in finding that a reasonable officer would believe that Garcia consented voluntarily to the search of his suitcase, the district court also did not err in holding that the search did not violate Garcia's Fourth Amendment right to be secure against unreasonable searches. *See Espinoza*, 885 F.3d at 523. Thus, the evidence obtained during the search was not the fruit of a constitutional violation demanding its suppression. *See United States v. Lopez-Tubac*, 943 F.3d 1156, 1161 (8th Cir. 2019).

## III.

For the foregoing reasons, we affirm.

-15-

KELLY, Circuit Judge, dissenting.

In this case, we must decide whether it was objectively reasonable for Finn to believe that Garcia understood the request to search his checked suitcase and knowingly and voluntarily consented to the search. See ante at 5–6, 10.[1] I agree that, to resolve these questions, it is appropriate to consider indicators such as "the context of the conversation," Garcia's responses to Finn's questions, and whether Finn "relied on a translation produced by a reliable source." See id. at 6. But in my view, these indicators do not support, and in fact undermine, the district court's findings. Accordingly, I respectfully dissent.

Garcia brought two pieces of luggage on his trip from Denver to Indianapolis: a large, checked suitcase and a small, cloth Adidas carry-on bag. During a stop in Omaha, he left his Adidas bag on the bus and went into the terminal. Meanwhile, the checked luggage was pulled out from under the bus to determine which bags needed to be transferred. Finn examined the checked luggage and found Garcia's suitcase to be suspicious. He approached Garcia in the terminal, showed his badge, and said in English, "you're not in trouble, you're not under arrest, nothing like that. Um, what we do is just talk to people . . . ." Then, noticing Garcia's blank look, Finn asked whether Garcia spoke English: "*¿habla inglés?*" Garcia indicated that he did not speak English, but he did speak Spanish. After learning this, Finn did not explain in Spanish that Garcia was not in trouble, was not under arrest, and was free to leave.

Finn asked Garcia a few simple questions in "broken Spanish," and Garcia responded appropriately. Then Finn asked in English to see Garcia's identification and boarding pass. I do not agree that Garcia produced these documents "without expressing any difficulty." Ante at 3. Finn asked Garcia in English, "do you have ID on you by chance?" Garcia put his boarding pass in his sweater pocket, pulled

---

[1]I agree with the court that, if Garcia did comprehend and consent to the search, his consent was not the result of duress or coercion. See ante at 11–14.

-16-

his wallet out of his back pocket, and gave Finn an ID. After examining the ID, Finn gestured with his fingers, pointed at the bus, and asked, "is it okay if I look at your boarding pass? The bus pass?" Garcia did not appear to understand and began rummaging around in his wallet. Finn clarified his request by pointing to Garcia's sweater pocket and saying, "your ticket?" Garcia said, "oh," and handed Finn his boarding pass.

Looking at the boarding pass and luggage ticket, Finn asked, "*¿uno bolsa?*" ("number one bag?")[2] and held up his right index finger to indicate the number one. Garcia responded "*un*" ("one"), "*sí*" ("yes"). Then Finn asked, in English, "did you take the bus to, to Colorado? Or ah, you taking the bus back home?" Recognizing that Garcia did not understand, and that Finn had reached the limits of his Spanish-speaking abilities, Finn pulled out his phone and began asking Garcia questions using a translation application. At the suppression hearing, Finn could not recall exactly what questions he asked through the application, and he was unable to verify that the application produced a "legit translation," but he stated that, at that time, Garcia did not appear to have any problems understanding the application.[3]

Eventually, Finn decided to ask for consent to search Garcia's checked suitcase. Finn had access to a Spanish-language consent-to-search form, and in the absence of an on-site translator, it would have been "desirable" to use that form in

---

[2]As the court notes, Finn intended to ask "one bag?" Ante at 3.

[3]After Garcia was arrested, Finn attempted use the application to advise Garcia of his Miranda rights and to ask additional questions. Dr. Navarrete testified that there was confusion regarding the application at that point. In response to Finn's questions, Garcia said, "*¿cómo? No entiendo ahí*" ("what? Don't understand that"). He also said, "*No entiendo*" ("I don't understand"). Garcia later reiterated, in broken English, "ah, the app, I can't understand the app." Garcia's body language indicated that he was confused, and another officer remarked that Garcia did not understand Finn's questions. Finn decided that the application was inadequate to overcome the language barrier and that he would need to get an interpreter.

-17-

this situation. See Cedano-Medina, 366 F.3d at 687. But rather than using the form designed for this purpose, Finn continued to use the translation application.

Finn's reliance on the translation application and his own "broken Spanish" created confusion. Through the application, Finn asked if he could search Garcia's "*bolsa*" ("bag"). Garcia responded "*sí*" ("yes"). At that point, Finn subjectively believed that Garcia understood Finn wanted to search the checked suitcase—the only "bag" Finn was aware of at the time—and had consented to the search. But the word "*bolsa*" in Spanish does not have the same expansive meaning as the word "bag" in English. Dr. Navarrete testified that a *bolsa* is a small, cloth bag; the word refers to both "the material and the shape." He explained that "[i]t could, through different parts of Latin America, could take you to pocket, pants pocket, jacket pocket. It could be a grocery plastic bag, or a grocery sack. It could be a lady's handbag." Dr. Navarrete testified that the checked suitcase was not a *bolsa*. It was "*equipaje*" ("luggage") or a "*maleta*" (a "suitcase"). Garcia's small, cloth Adidas carry-on bag, on the other hand, was a "*bolsa*."

The court acknowledges that Finn may not have used the correct Spanish word to request consent to search the checked suitcase. See ante at 6, 8. But it concludes that it is reasonable to believe that Garcia understood Finn was asking to search the checked suitcase and consented to the search because Finn pointed at Garcia's checked-baggage ticket when he first used the incorrect word *bolsa*, and the suitcase was Garcia's only piece of checked luggage. Id. at 7.

I disagree. In my view, it is not objectively reasonable to believe that pointing at an English-language checked-baggage ticket would change a Spanish-speaker's understanding of the word *bolsa*. See Jimeno, 500 U.S. at 251 (explaining that the standard is "'objective' reasonableness"). Dr. Navarrete testified that, "[i]f I'm pointing to a suitcase and I call it a *bolsa*," a Spanish-speaker would know that I was referring to the suitcase. But Finn did not point at the suitcase he was referring to. He pointed at an English-language ticket. Just as Finn's earlier gesture of pointing at the bus while requesting Garcia's bus ticket did not clarify the question's meaning,

I see no reason to believe that pointing at an English-language ticket would change Garcia's understanding of the word *bolsa*.[4]

And even if it was initially reasonable for Finn to believe that Garcia knew Finn wanted to search the checked suitcase and had consented to the search, those beliefs became unreasonable as the interaction unfolded. After they left the terminal, Garcia began heading on to the bus to retrieve his small, cloth Adidas bag. But Finn stopped at the luggage area because he was "not interested in what was inside the bus, [he] wanted to talk about the suitcase." Garcia appeared to be confused and again gestured toward the bus. Finn pointed at the luggage area and asked Garcia, "do you have one down here?" Garcia responded, "*una maleta*" ("a suitcase"). Finn said, "what's that? You don't have luggage back down here? Ahh, is this one yours?" Dr. Navarrete testified that this confusion stemmed from Finn's use of the word *bolsa*, which "ha[d] taken the Spanish-speaker to the smaller cloth bag."

It is clear from Finn's actions after the arrest that he realized he and Garcia were not initially referring to the same bag. Immediately after Garcia was arrested, Finn went on to the bus, telling another officer who assisted in the arrest, "he's got another one up here, I'm gonna go check that out." Finn similarly told the bus driver, "he said he had another bag up here somewhere." At first, Finn did not find anything. He returned to the other officers and explained that Garcia had mentioned another bag when they "first started talking," but Finn "didn't see another one up there." Garcia continued to insist that his bag was still on the bus, and Finn eventually returned to the bus, where he found Garcia's small, cloth Adidas bag.

---

[4]The court is right that there are factual differences between these two requests, <u>see</u> <u>ante</u> at 7 n.3, but it misses my broader point. The exchange regarding Garcia's bus pass illustrates that there is large difference between pointing at the object the speaker is referring to ("your ticket") and pointing at a separate object (the bus). Dr. Navarrete testified that an ordinary Spanish speaker would understand a speaker's meaning if the speaker pointed at a suitcase and used the word "*bolsa*." But there is nothing in the record to support the court's conclusion that pointing at a separate object—like an English-language ticket—would have the same effect. <u>See</u> <u>ante</u> at 7.

In light of the objective meaning of the word *bolsa*, Garcia's actions showing that he was referring to a bag on the bus, and Finn's actions demonstrating that he understood this, I do not agree that it was reasonable to believe that Garcia understood Finn's request and consented to a search of his checked suitcase inside the terminal, when he responded "*sí*" ("yes") to Finn's request to search his *bolsa*. See ante at 7–8, 11.

The question then becomes whether it was reasonable for Finn to believe that, after the two left the terminal, Garcia gave consent to search the checked suitcase or expanded the scope of his consent to include the checked suitcase. See ante at 9–11. As Finn and Garcia approached the bus, and the confusion about which bag Finn wanted to search became clear, Finn stopped near the luggage area and identified the checked suitcase. Garcia indicated that the suitcase belonged to him. Finn pointed to the suitcase and began to ask in English, "is it okay if I . . . ." Realizing that Garcia would not understand an English-language request to search his suitcase, Finn changed his question mid-sentence and asked, "*¿permite?*" ("may I?"). In response, Garcia put his hands in the air, took a step back, dropped his chin, and quickly shook his head.

The district court found that this interaction "clarified any confusion that may have existed," and the court agrees. See ante at 9–10 & n.4. It is true that, as the court notes, Finn and Garcia had left the terminal so that Finn could search Garcia's *bolsa*. Id. But the video also shows that confusion permeated the entire encounter, especially when Finn asked Garcia questions in English and in the moments leading up to Finn's final question, "*¿permite?*" On its own, the question "may I" is ambiguous and invites the listener to wonder, "May you *what*?" Given Garcia's lack of comprehension leading up to this unclear question, I do not believe it was reasonable for Finn to expect Garcia to fill in the gaps from context.[5]

---

[5]I would not infer comprehension from Garcia's failure to object during the search. See ante at 10 n.4. Garcia had not been informed in Spanish that he was

The impediments to Garcia understanding Finn's request extended well beyond the use of an "imperfect translation." See ante at 6. The interaction was brief, and Finn did not pause to clarify that Garcia understood his question or that Garcia's quick, non-verbal response was an affirmative gesture. Cf. Gallardo, 495 F.3d at 988 (noting that the officer "followed up on his initial question by asking Gallardo if he understood and by twice asking Gallardo for confirmation that Gallardo had no problems with [the search]"); Cendano-Medina, 366 F.3d at 687 (concluding that it was reasonable for an officer to believe that, after several attempts, "Cedano-Medina eventually came around to understanding his questions about searching the truck"); Mendoza-Cepeda, 250 F.3d at 627 (describing a series of questions and responses indicating that the defendant understood the officer's questions and consented to a search through conduct). After Finn and Garcia left the terminal, Finn used a total of one Spanish word: "*¿permite?*"

After a careful review of the video, and considering the totality of the circumstances, I cannot say that it was reasonable for Finn to believe that Garcia's ambiguous gesture in response to this ambiguous question established that Garcia knowingly and voluntarily consented to a search of the checked suitcase. Cf. Guerrero, 374 F.3d at 588–89 (affirming the district court's conclusion that Guerrero did not knowingly and voluntarily consent to a search because it was "clear that a reasonable officer would have been aware that Guerrero was having difficulty understanding the questions" and Guerrero's responses were "ambiguous at best"). Instead, I am left with a firm and definite conviction that the government did not carry its burden by a preponderance of the evidence. See Garcia, 888 F.3d at 1008 (stating that we will not affirm if, "in light of the entire record, we are left with a firm and definite conviction that a mistake has been made" (citation omitted)); Cedano-Medina, 366 F.3d at 684–85 (describing the government's burden). Accordingly, I respectfully dissent.

_____

_____

free to leave, and I cannot say that his silent compliance with a law-enforcement investigation shows that he understood Finn's ambiguous request.